STATE of Minnesota, Respondent,

v.

Lemoyne Peter JONES, Appellant.

No. C9–85–906.

Supreme Court of Minnesota.

Aug. 15, 1986.

Michael F. Cromett, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, John MacGibbon, Sherburne Co. Atty., Kim Brandell, Asst. Co. Atty., Elk River, for respondent.

## OPINION

SCOTT, Justice.

Lemoyne Peter Jones appeals from a first-degree murder conviction rendered in Sherburne County District Court. He contends that the trial court erred in admitting certain *Spreigl* evidence and that it violated his right to a speedy trial and his right to effective assistance of counsel. Jones also argues that an agreement between the state and certain key witnesses for the state violated his due process rights. We affirm.

At approximately 11:45 p.m. on May 7, 1984, the Big Lake Police Department received a call that the home of Bruce Swanson was on fire. Before firefighters reached the house, a state trooper and an officer of the Big Lake Police Department arrived on the scene. The fire was intensely hot, and the two officers were unable to go into the house to check for any occupants. Shortly after the firefighters arrived and began to extinguish the fire, a man approached the state trooper. The man, later identified as Rick Blesi, told the trooper that he lived two blocks away and that shortly before he heard the fire sirens he had observed a man sitting in a car parked near Blesi's house. The trooper followed Blesi to the car.

Upon reaching the car, the trooper saw a man who appeared to be asleep in the front seat. The trooper radioed for assistance and an officer from the Sherburne County Sheriff's Department arrived. The officer noticed a two-way radio on the man's lap and some clothes in the back seat. He knocked on the window of the front door and the man reached for his keys in the ignition. The officer knocked on the window again and asked the man to get out of the car. Before doing so, the man tucked the two-way radio under the front seat. When asked, the man identified himself as "Sipe." He had no identification, however, and the officer was unable to find a record of his driver's license under that name. The police noticed that the man appeared to be under the influence of a controlled substance. They arrested him and took him into custody.

As a search incident to an arrest, the officer retrieved the two-way radio from the man's car and observed a binoculars case and an 18-inch screwdriver in the vehicle. The officer also checked the glove compartment and found an ashtray, a bag

containing a small amount of marijuana, and a plastic syringe. At the police station, the man said his name was Craig Jesinoski. Police learned that the daughter of the registered owner of the car, Brenda Thompson, had lent it to Jesinoski a few days earlier but Jesinoski had not returned the car on the agreed-upon date. A complaint was issued, charging Jesinoski with possession of a controlled substance, driving while intoxicated, and the unauthorized use of a motor vehicle.

The fire at the Swanson home was under control by 1:30 a.m. At that time, the firefighters entered the house to search for victims. In the front room firefighters found a body covered by plasterboard and insulation. Near the body they found a fire extinguisher and a five-gallon gasoline can. A can of paint thinner was found in the kitchen. The state fire marshall and the Bureau of Criminal Apprehension were called in to investigate.

Through dental records the body found in the house was identified as Bruce Swanson, the owner of the home. A medical examination of the body revealed that Swanson was dead at the time of the fire. A reconstruction of Swanson's jaw disclosed a bullet hole in the chin. The cause of death was determined to be a gunshot wound to the head and neck.

Investigators determined that the fire originated in the front room of the house near the location where Swanson's body was found. They noted that the burn patterns were consistent with those associated with an accelerant. Traces of two kinds of accelerant, gasoline and mineral spirits, were found on the scene.

On May 8, 1984, the police obtained a warrant to further search the car in which Jesinoski was apprehended. Thompson, who had lent the car to Jesinoski, identified her belongings in the car. She also identified several other items. The police seized clothing belonging to a man named Lemoyne Peter Jones, several carrying cases containing a large quantity of prescription drugs, pistol ammunition of different calibers, and a plastic syringe.

On May 16, 1984, Sherburne County police further investigated the Swanson home. Under the area where Swanson's body was found, police noticed a hole and plywood splinters. Upon searching the basement under the area where the body was discovered, police found bullet fragments. In the basement area directly beneath one of the bedrooms, an intact bullet was found.

The Minneapolis Police Department informed Sherburne County officials that Jesinoski, the man apprehended on the night of the fire, and Jones, the man whose clothes were found in Thompson's car, were suspects in recent armed robberies of drugstores in the Minneapolis area. Jones was arrested by Minneapolis police after witnesses to one drugstore robbery identified him as one of the robbers. On May 21, 1984, Jesinoski appeared in Sherburne County District Court in connection with the complaint charging him with possession of a controlled substance, unauthorized use of a motor vehicle and DWI. Pursuant to the request of the Minneapolis Police Department, however, he was arrested that day on an additional charge, armed robbery.

Upon his arrest, Jesinoski was transferred to Minneapolis, where he gave a statement to police. He admitted that on May 7, 1984, he and Jones robbed drugstores in Minneapolis and then picked up a man named Gregory Custer. The three men drove to Big Lake with the intent of robbing Swanson, who they suspected had large quantities of drugs stored in his house. Jesinoski stated that Jones and Custer left the vehicle upon arriving at Swanson's home. One of them possessed a weapon which Jesinoski believed to be a .45 caliber pistol. Jesinoski told the police that he stayed in the car, which was to be used as the "get-away" vehicle after the robbery had been completed. He stated that he fell asleep in the car and was awakened sometime later by two police officers.

On May 23, 1984, Jesinoski, Custer, and Jones were charged in Sherburne County District Court with first-degree murder.

Custer and Jones were also charged with first-degree arson and first-degree murder committed during the course of a felony. Custer, who had not yet been apprehended, was immediately arrested in Minneapolis.

On June 22, 1984, a Sherburne County Grand Jury indicted Custer, Jesinoski, and Jones for the murder of Swanson. In light of the statements obtained from Jesinoski and Custer, however, the police suspected that Jones, not Jesinoski or Custer, shot Swanson. In return for his testimony at Jones' trial, Jesinoski was allowed to plead guilty to second-degree murder. The other charges against him were dropped.[1] Custer also pled guilty to second-degree murder in exchange for his testimony at the trial.[2]

Jones' trial commenced on December 20, 1984. Jesinoski testified that in early April, 1984, he and two friends drove to Big Lake to "case" Swanson's house. He stated that he knew Swanson had been selling marijuana for some time and thought it likely that Swanson would have thousands of dollars worth of drugs in his house. Jesinoski testified that it was not until the early morning of May 7 that he returned to Swanson's house, this time with Jones. The two planned to burglarize the house at that time, he testified, but were unable to do so because construction workers were at the house next door to Swanson's. Jesinoski said he and Jones then returned to Minneapolis.

In Minneapolis, Jesinoski and Jones went to the home of Judy Moore, where they injected drugs. They then decided to rob drugstores in order to obtain more drugs. By noon they had stolen approximately 1100 Percodan pills and 2500 Valium pills. Jesinoski testified that they then went to Jones' mother's house in south Minneapolis, where they injected themselves with more drugs. In the late afternoon they returned to Moore's house in north Minneapolis and shortly thereafter went to Custer's home, where once again they injected drugs, including liquid Demerol and liquid morphine.

Using Thompson's car, Jesinoski, Custer, and Jones went to a home in Columbia Heights, where they exchanged some of the Percodan pills for cocaine. From there, the three proceeded to Jimmy B's, a bar in Anoka. Jesinoski testified that they knew Swanson frequented the bar and they wanted to determine if he was there that night. If he was, they planned to proceed to Big Lake and burglarize his house. In the parking lot of the bar, the three injected themselves with more liquid morphine and liquid Percodan. Thereafter, Jesinoski testified, he went into the bar, but did not see Swanson there.

Jesinoski testified that the three left the parking lot in Thompson's car and proceeded toward Big Lake. He also stated that Jones drove the car and he gave directions. Upon arriving in Big Lake, they stopped and injected more drugs. Jesinoski testified that Jones asked him to get the two-way radios from the car. Custer then told Jesinoski that they would notify him on Channel 1 when they had completed the burglary. Jesinoski got behind the steering wheel of the car, and Jones and Custer headed toward Swanson's house, which was two or three blocks away. Jesinoski stated that after Custer and Jones left he parked the car five or six blocks away from Swanson's house and began injecting liquid Demerol. He also testified that he might have smoked a marijuana cigarette. He said he eventually fell asleep and did not awaken until the police officers knocked on the window of the car sometime later.

1. These charges were: first-degree murder during the commission of a felony, unauthorized use of a motor vehicle, possession of a controlled substance, and DWI. In addition, Hennepin County agreed not to charge Jesinoski with aggravated robbery.

2. As part of Custer's plea negotiations, Hennepin County agreed not to prosecute him for his alleged involvement with Jones in an aggravated robbery on April 24, 1984. It was also agreed that Sherburne County would recommend to the court that Custer be sentenced for second-degree murder at the low end of the Sentencing Guidelines grid.

On the stand, Custer testified that he and Jones left Jesinoski in the car on the night of May 7 and approached Swanson's house—he carrying the two-way radio and Jones the .45 caliber pistol. Custer stated that Jones went inside the open door of the house while he remained behind, hiding in some trees. For approximately five minutes Custer waited, until Jones waved him into the house. Upon entering the house, Custer saw a man in the front room lying face down on the floor. The man yelled, "Could I see your badges?" Custer stated that Jones told him to watch the man while Jones tied him up. Custer testified that Jones asked him to take the gun but that he refused. Jones then put the gun on the floor and tied the man up with a telephone cord.

Custer stated that after the man had been tied up, he began searching the back bedroom for drugs and money. He found neither. He then went into the kitchen. While searching the kitchen, he heard "a couple of gunshots," which seemed to come from the front room. He looked into the room and saw Jones standing over Swanson with a gun. Custer testified that he noticed blood on the carpet next to Swanson. He stated that he immediately ran out of the house through a back door of the . kitchen. When outside he heard "a couple more shots" from the house.

Jones eventually emerged from the house, Custer testified. Thereafter, Custer called to Jones. The two tried to reach Jesinoski on the radio, but he failed to answer their call. They then reentered Swanson's house to try to find the keys to one of Swanson's cars. Custer found a set of keys in Swanson's jacket. He went into the front room to tell Jones this, and saw Jones stabbing the man with a knife. Custer then went to Swanson's truck and drove it out of the garage. Jones eventually emerged from the house carrying a brief-case containing marijuana and a revolver. After Jones entered the truck, Custer noticed flames in the front window of the house.

Custer testified that he and Jones took the truck to within two blocks of Custer's apartment in Minneapolis. There, Custer got the keys to a car he was using. Jones then drove the truck to an alley near University and Lowry in northeast Minneapolis, with Custer following in the car. Jones abandoned the truck in the alley after unsuccessfully trying to set it afire. Custer testified that throughout this time there was very little conversation between himself and Jones. He did say, however, that en route to Minneapolis, Jones told him that he "had to do it" because Swanson "looked like he'd come looking for me."

Judy Moore testified that Jones arrived at her house in north Minneapolis sometime late on May 7, or after midnight on May 8, 1984. Moore had been dating Jones and, upon his arrival, the two had an argument about their relationship. Moore said Jones asked her to lend him $20; he said he would give her a gun he had for security. She refused to give him any money. Moore testified that several people were at her house injecting drugs and drinking alcohol when Jones arrived; she could not remember most of the people but did testify that a man named Michael Flood was present.

Flood testified that Jones was alone when he arrived at Moore's house that night. He said Jones offered him a gun if he would give Jones some pills. Flood testified that he refused the offer, but he did see Jones carrying what he believed was a .38 caliber Smith & Wesson revolver in a brown paper bag. Flood said he was curious that Jones was carrying a .38; he testified that Jones usually had a .45 automatic pistol with him. Flood said that he asked Jones where his .45 was and Jones replied, "I had to get rid of it." Flood also testified that Jones told him and a man named Jerry McMillan: "You guys, I blew that guy away; I didn't want to." Jones left Moore's house with Flood and McMillan. Flood testified that he drove to the house where he and his wife were staying and that Jones made a phone call there. Flood did not know who Jones had called but did hear Jones yell to the person on the

phone: "If you get the car back you had better cough up whatever possessions I had in the trunk or you'll end up like the guy that I burned." Thereafter, McMillan took Jones to Jones' mother's house. The time was approximately 4:00 a.m.

Joan Herlofsky testified that on May 11, 1984, Jones asked her and her boyfriend, Michael Lewandowski, to drive him to Florida. Herlofsky said Jones made the request after watching the news at Custer's house. It had been reported that the Minneapolis police had raided Moore's house. Jones told Herlofsky that he would pay for the cost of the trip.

Jones, Herlofsky, and Lewandowski planned to leave for Florida the following day, May 12. That afternoon, the three stopped at the Mississippi River near the Broadway Bridge in Minneapolis. Herlofsky testified that Jones wanted to dump something into the river. Herlofsky said that upon arriving at the river, Jones got out of the car, opened the trunk and walked onto a railroad bridge. She said she could not see what Jones was throwing into the river. After making several other stops that afternoon and evening, the three decided to stay overnight at Jones' mother's house. They left for Florida the following morning. Herlofsky testified that in Athens, Georgia, she and Lewandoski left Jones in a motel room without telling him they were going back to Minnesota.

Ernest Meyer, a Minneapolis police officer, testified that a search of the Mississippi River near the Broadway Bridge turned up no evidence. Meyer did testify, however, that a bullet was recovered from the home of Robert Verdon, an acquaintance of Jones. The bullet was from a .45 caliber pistol. The markings on the bullet were compared with those on the bullet found in Swanson's home in Big Lake. A crime laboratory analyst testified that the two bullets had likely been fired from the same .45 caliber pistol.

Verdon testified that the .45 caliber bullet had become lodged in the banister in his house during an exchange of gunshots between himself and Jones sometime in March or April, 1984. He explained that one night he had been awakened by noises in the house. He arose from his bed and, upon entering the hallway, saw a man he could not identify. He then saw another man in the kitchen, he testified, who appeared to be leaving the house. When he proceeded to the front entryway, he saw Jones, who was carrying a .45 automatic pistol. Verdon had his .22 caliber revolver with him and told Jones to drop his gun. Verdon testified that Jones immediately dropped to the floor and began shooting at him. He stated that he then returned Jones' fire and Jones left the house. Verdon said he later picked up four bullets from the floor and noticed that one of the bullets Jones fired at him had become embedded in the banister in the hallway.

Later in the trial, Custer testified that he, Flood, and Jones had tried to rob Verdon on April 24, 1984, the night Jones and Verdon exchanged gunshots. This testimony was admitted by the trial court over the objection of Jones.

The trial court also admitted evidence of a robbery at the Butler Drug Store on May 7, 1984, a robbery that Jesinoski claimed was committed by himself and Jones. The pharmacist who worked at the drugstore on May 7 testified that she saw a man, whom she later identified in a line-up as Jones, enter the store on that date. He pointed a gun at her, she testified, and demanded several "class-A drugs." She said she retrieved several hundred Valium and Percodan pills and gave them to Jones as ordered. Upon receiving the pills, Jones told her to lie on the floor behind a counter. He then left the store.

Thereafter, the state rested its case. No witnesses for the defense were called, and Jones did not testify.

On January 15, 1985, after 15 hours of deliberation, the jury reached its verdict. It found Jones guilty of murder in the first degree, intentional felony murder, and murder in the second degree. Jones was found not guilty of first-degree arson. He was sentenced to life imprisonment on the conviction of first-degree murder.

In this court, Jones contends that: (1) the plea negotiations between the state and witnesses Jesinoski and Custer violated his rights under the due process clause of the fourteenth amendment to the United States Constitution; (2) the trial court erroneously admitted evidence of prior crimes and bad acts under *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965); (3) he was denied his sixth amendment right to a speedy trial; and (4) he had ineffective assistance of counsel.

1. Jones argues that the state's negotiations with Jesinoski and Custer violated "fundamental fairness" inherent in the due process clause of the fourteenth amendment because the negotiations, he claims, conditioned the favorable treatment in sentencing of the two co-conspirators on their *favorable* testimony, rather than on their *truthful* testimony. Jones relies on *United States v. Waterman,* 732 F.2d 1527 (8th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985).

In *Waterman,* a panel of the United States Court of Appeals for the Eighth Circuit held that the government cannot, consistent with the due process clause, offer favorable treatment to a prosecution witness contingent upon its success in convicting the defendant against whom the witness is testifying. "Such an agreement," the panel stated, "is nothing more than an invitation to perjury having no place in our constitutional system of justice." *Id.* at 1531. The panel voted to reverse the district court, vacating Waterman's sentence and ordering his release from custody.[3]

Most courts that have considered the question have distinguished the plea negotiations at issue in their cases from the negotiations at issue in *Waterman,* thereby avoiding the constitutional debate. *See United States v. Moeckly,* 769 F.2d 453 (8th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1196, 89 L.Ed.2d 311 (1986)

(agreement referred to truthfulness and was not contingent on the government's success in obtaining convictions); *United States v. Carcaise,* 763 F.2d 1328 (11th Cir.1985) (no evidence of any such contingent agreement); *United States v. Kenney,* 598 F.Supp. 874 (D.Maine 1984) (agreement not contingent on success of indictment or conviction); *State v. Sirek,* 374 N.W.2d 481 (Minn.Ct.App.1985), *rev. denied,* (Minn., November 1, 1985) (the contingency was to ensure the witness' testimony, not its content).

Some courts, however, have recognized the *Waterman* principle that, at some point, due process vitiates contingent agreements that provide too great an incentive to the witness to commit perjury. In *United States v. Baresh,* 595 F.Supp. 1132 (S.D.Texas 1984), the court concluded that the government's agreement provided an incentive for the witness to commit perjury, stating: "It is apparent from this record that the largess of the prosecution's benevolence to Quiroga [the witness] placed far more stress upon his veracity (though buttressed by the government's requirement of truthfulness) than its gossamer frailness could withstand." *Id.* at 1135. The testimony of the witness was held to be inadmissible. *Id.* at 1137. In *United States v. Eschweiler,* 745 F.2d 435 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1985), the United States Court of Appeals for the Seventh Circuit, although refraining from adopting the *Waterman* rule, stated: "Of course there are limits to how far the government may go to induce a witness to cooperate." *Id.* at 439.

Not all courts, however, have recognized a constitutional limit. To some courts, the issue is not one of admissibility, but of credibility. The fact that the testimony of a cooperating witness may be tainted by a contingent agreement with the government

3. Waterman's case, however, was then considered by the appeals court en banc, and the judgment of the district court was affirmed by an equally divided court. This action of the court en banc leaves the precedential value of

the panel's opinion in doubt; nevertheless, the original opinion has often been cited and has initiated much discussion concerning the exact limits the due process clause places on such plea negotiations.

can be disclosed to the jury during cross-examination of the witness on the stand. Moreover, these courts hold, the standard cautionary instruction concerning the testimony of accomplices serves to adequately inform the jury of the risk of perjury in such cases. *See United States v. Dailey,* 759 F.2d 192 (1st Cir.1985) (leaving the entire matter to the jury to consider in weighing credibility); *United States v. Jones,* 575 F.2d 81 (6th Cir.1978) (holding that there is no overriding policy that excludes the testimony of an informant who was paid under a contingent fee agreement for the conviction of specified persons).

The standard safeguards of cross-examination and proper jury instruction, however, were not enough for the *Waterman* panel. It stated:

> Waterman and the jury were made aware of the letters between Gamst's [the witness'] attorney and the government. This disclosure was insufficient, however, to overcome the due process problems inherent in the contingency agreement itself. In the first place, the government's December 18, 1980, letter only vaguely adopted the contingent nature of the agreement, so the jury might have assumed that the government was committed to help Gamst in the same manner regardless of the fruitfulness of his cooperation. More fundamentally, however, we see no place in due process law for positioning the jury to weed out the seeds of untruth planted by the government. Certainly Gamst might have lied regardless of the contingency agreement and the jury was generally commissioned to determine the truth of his testimony; but that is no reason for the government to give him further incentive to selectively remember past events in a manner favorable to the indictment or conviction of others.

*Waterman,* 732 F.2d at 1532 (footnote omitted).

There are, of course, some limits on the state's inducements to a witness. We need not, however, in this case delineate those limits. Here, the plea negotiations did not condition the state's acceptance of the witnesses' guilty pleas to second-degree murder on the successful conviction of Jones; they were not inducements to commit perjury. Both agreements stated that if either witness testified falsely the plea arrangements would be void and the witnesses could be tried for first-degree murder. It is apparent from the written agreements that the state in this case was not attempting to reward its witnesses based on the *results* of their testimony. Moreover, there is no evidence that the police orally placed such a condition on the agreements. The two witnesses in this case understood that their plea negotiations with the state were conditional only on their truthful testimony at Jones' trial.

 We have never held that plea negotiations granting favorable treatment to prosecution witnesses in return for truthful testimony are *per se unconstitutional* under the federal constitution or our own state constitution, and we decline to so hold today.[4] The decision to allow an accomplice to plead guilty to a lesser crime if he or she provides truthful information and testimony is a proper exercise of prosecutory authority. *See, e.g.,* A.B.A. Standards for Criminal Justice, The Prosecution Function, Standard 3–3.9(b)(vi) (Approved Draft 1979). Such negotiations do not necessarily make an accomplice's testimony so unreliable that it must be excluded from evidence, for they in no way bind the witness' testimony; he or she is free to testify truthfully and fully without fear of reprisals on the part of the government.

 We hold that the plea negotiations between the state and the witnesses in this case did not so taint Jesinoski's and Custer's testimony as to violate Jones' due process rights.

---

4. Several United States circuit courts of appeals have held that such agreements are not per se illegal under the federal constitution. *See, e.g., Dailey,* 759 F.2d at 200; *Eschweiler,* 745 F.2d at 438; *United States v. Librach,* 536 F.2d 1228, 1229–30 (8th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976).

2. Five months before the start of Jones' trial, the state notified Jones that it planned to offer at trial, as *Spreigl* evidence, Jones' involvement in the robbery of the Butler Drug Store on May 7 and the attempted robbery of Verdon's home on April 24. At trial, during the direct examination of Jesinoski and Custer, the state informed the jury of its plea negotiations with the two witnesses. The state disclosed to the jury that each witness would be allowed to plead guilty to second-degree murder in exchange for the witness' truthful testimony. The state did not, however, inform the jury that, as part of its written agreement with the witnesses, Custer would not be charged with attempted aggravated robbery of Verdon's home on April 24 and Jesinoski would not be charged with the aggravated robbery of the Butler Drug Store on May 7.

On cross-examination, Jones sought to elicit these facts from the witnesses. The court ruled, however, that if Jones elicited such information he would be waiving his right to object to the introduction of the two prior acts as *Spreigl* evidence later in the trial. Jones challenged this ruling in chambers, contending that the questions he planned to ask the witnesses on cross-examination would be limited to the written plea agreement itself and would not relate to Jones' involvement in the two robberies. He argued that he would not be "opening the door" so as to constitute a waiver.

It is apparent that the trial court placed an absolute condition on Jones' ability to disclose to the jury all of the details of the written plea agreements with the witnesses: if Jones chose to elicit any information about the robbery charges against the witnesses, he necessarily would be waiving his right to later challenge any information tying him to the two prior acts. Such an absolute rule fails to consider the importance of cross-examination in our adversarial system of justice. It has long been established that the jury can best determine the credibility of a witness when the ability of a party to cross-examine is unhampered. In cases in which accomplices to the crime testify in return for favorable treatment by the state, an inquiry before the jury into the details of the plea negotiations is not only proper but vital to a fair resolution of the issue of credibility. Jones was apparently cognizant of this fact and, in light of the court's absolute rule, decided to cross-examine the witnesses about the robbery charges.

It is also apparent from the transcript that Jones' cross-examination did not "open the door" to all evidence that linked him to the two prior bad acts. The cross-examination was limited to the written plea agreement itself and did not delve into the details surrounding the events of April 24 and May 7.

A more reasoned approach for trial courts to take in these cases is to defer a ruling on the waiver question until the cross-examination has been completed. If the examination is not limited to the facts of the plea negotiations, the court can, at that time, properly determine that the party has waived his or her right to later challenge the introduction of such information as *Spreigl* evidence. However, if the examination is limited to the plea negotiations, as was the case here, the court is precluded from ruling that a waiver of such a right has occurred. A full *Spreigl* hearing would then be required before the information could be admitted as *Spreigl* evidence. This approach affords the defendant an adequate opportunity to cross-examine witnesses about their plea negotiations with the state.

Here, however, the trial court's action did not result in any prejudice. Jones had an adequate opportunity to cross-examine the witnesses about the full details of their plea negotiations with the state. Moreover, no prejudice resulted from the *Spreigl* evidence that the court admitted. Such evidence was clearly admissible under the principles we adopted in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965), and its progeny.

In *Spreigl*, we noted that proof that a defendant has committed crimes or bad acts other than those included in a current

charge may, in many circumstances, be relevant to prove the defendant's guilt. We held that evidence of other crimes or bad acts is admissible if it tends to establish: a common scheme on the part of the defendant; the defendant's motive for or intent to commit the current crime; the absence of mistake or accident in committing the current charge; or the identity of the accused. We stated, however, that evidence of other crimes or bad acts may not be introduced to establish a defendant's character and to show that the defendant acted in conformity therewith. *See also* Minn.R.Evid. 404(b).

In determining the admissibility of evidence of other crimes or bad acts, a trial court cannot merely conclude mechanically that the evidence fits within one of the permissible purposes we enunciated in *Spreigl*. We noted in cases following *Spreigl* that a careful consideration of questions of probative value and prejudice is required. *See State v. Morrison*, 310 N.W.2d 135, 137 (Minn.1981) (trial courts must determine that the evidence is "relevant and material to the state's case"); *State v. Bolts*, 288 N.W.2d 718, 719 (Minn. 1980) (before admitting such evidence trial courts must rule that the probative value of the evidence outweighs any potential for "unfair prejudice"); *State v. Billstrom*, 276 Minn. 174, 179, 149 N.W.2d 281, 285 (1967) (there must be "clear and convincing evidence" that the defendant participated in the crime or bad act); *see also* Kuhns, *The Propensity to Misunderstand the Character of Specific Acts Evidence*, 66 Iowa L.Rev. 777, 780 (1981).

The application of this case law to the case at bar results in a determination that the evidence of Jones' illegal activities on April 24 and May 7 was admissible at his trial. The evidence of the two prior acts could properly be introduced to show Jones' motive for entering Swanson's home on the night of the robbery-murder. The probative value of this evidence outweighs the potential for any unfair prejudice because the prior robberies were not vicious crimes that would likely inflame the jury,

nor were they more serious than the crime with which the defendant was currently charged. Cautionary instructions concerning the evidence were given to the jury. Moreover, the introduction of this evidence was both relevant and material to the state's case. The evidence of the April 24 robbery attempt allowed the state to establish that the .45 caliber bullet found in Verdon's home and the .45 caliber bullet found in Swanson's home had likely been fired from the same pistol, the kind of gun owned by Jones. Evidence of the May 7 drugstore robbery enabled the state to introduce evidence regarding Jones' great need for drugs and money. Furthermore, as the trial court determined after conducting its own hearing, there was clear and convincing evidence tying Jones to both the robberies, evidence which included testimony of eyewitnesses. The fact that the trial court conducted a hearing on the evidence linking Jones to the two prior acts provided yet another safeguard.

We therefore hold that the *Spreigl* evidence admitted at Jones' trial was properly presented to the jury.

3. Jones argues that the seven-month delay from the date of his arrest to the date of his trial constitutes a deprivation of his right to a speedy trial, a right he claims he asserted throughout the seven-month period. The sixth amendment to the United States Constitution provides that an accused shall enjoy the right to a speedy trial. Through the fourteenth amendment, this right applies in state criminal proceedings. Whether the delay in any given case constitutes a deprivation of this right depends on the balancing of several factors, an approach that was first enunciated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

In *Barker*, the United States Supreme Court refused to promulgate a specific time period within which a criminal trial must commence. Instead, the Court stated:

We can do little more than identify some of the factors which courts should assess in determining whether a particular de-

fendant has been deprived of his right [to a speedy trial]. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.

*Id.* at 530, 92 S.Ct. at 2191–92 (footnote omitted). The Court recognized that the first factor, the length of delay, is to some extent a triggering mechanism in that until some delay, which is presumptively prejudicial, is evident the other factors need not be considered. The delay in speedy-trial cases is calculated from the point at which the sixth amendment right attaches: when a formal indictment or information is issued against a person or when a person is arrested and held to answer a criminal charge. *See United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Here, Jones was arrested and charged on May 23, 1984. His trial commenced on December 20, 1984. This delay of seven months is long enough to trigger the consideration of the other *Barker* factors. *See, e.g., State v. Corarito,* 268 N.W.2d 79 (Minn.1978).

The delay in this case appears to be the result of our overburdened judicial system. After Jones' initial appearance, a grand jury was called. The jury returned an indictment one month later. An omnibus hearing was immediately scheduled, but not held until six weeks after the return of the indictment, due to a delay in the preparation of the grand jury transcripts. Although the omnibus hearing was held in August, the trial court did not issue its findings until November 15. The trial commenced on December 20.

■ The reason for this delay must weigh against the state. The responsibility for an overburdened judicial system cannot, after all, rest with the defendant. The reason for the delay here, however, weighs less heavily against the government than, for example, a deliberate attempt on the part of a prosecuting attorney to delay a trial.

■ There is no evidence from the transcript that Jones, at any time during the proceedings, waived his right to a speedy trial. In fact, he asserted the right throughout the process. At the initial appearance on May 25, 1984, Jones requested a speedy trial. He made a similar request on June 25, 1984, during an appearance made on return of the indictment. At the omnibus hearing, the court was once again informed of Jones' request for a speedy trial. The fact that Jones persisted in asserting his right to a speedy trial is important. The United States Supreme Court noted in *Barker:* "The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Barker,* 407 U.S. at 531–32, 92 S.Ct. at 2192–93.

Although the court was aware of Jones' requests for a speedy trial, it made no effort to facilitate his demands. The court noted that, although Jones had demanded a speedy trial, Rule 11.10 of the Minnesota Rules of Criminal Procedure only provides that a trial be held within 60 days of such a demand when the demand is made after a plea of not guilty has been entered. Because Jones' requests were made before he pled not guilty on November 16, 1984, the court did not honor his demands.

■ The comments to Rule 11.10, however, state: "The consequences and the time limits beyond which a defendant is considered to have been denied his constitutional right to a speedy trial are left to judicial decision." It is clear that the right to a speedy trial is triggered not when a plea is entered but when an indictment is issued or an arrest is made. *See Marion,* 404 U.S. at 320, 92 S.Ct. at 463. The trial court, thus, should not only have turned to the Rules of Criminal Procedure, but should also have considered the case law on this issue.

■ No unfair prejudice is evident, however, from the seven-month delay in this case. There is no evidence that, due to the delay, the witnesses at trial were unable to recall the essential facts surround-

ing the murder of Bruce Swanson. No witnesses were called by Jones, and he does not now contend that a witness whom he would have called died during the seven-month period. There is, moreover, no evidence that Jones' detention impaired his right to fair representation at trial. Jones' right to a speedy trial was therefore not violated.

4. Jones, in a pro se brief, contends that his sixth amendment right to counsel was violated in that his appointed counsel at trial failed to seek a change of venue, did not hire an investigator even though the trial court apparently released funds for such a purpose, and did not interview witnesses who Jones claims were willing to testify in his behalf. The United States Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel," *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970), and that counsel can violate a defendant's right to effective assistance by failing to provide adequate legal assistance, *Cuyler v. Sullivan*, 446 U.S. 335, · 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court set out the test for reversing a conviction on grounds of ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown

in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

In cases in which a convicted defendant complains of the ineffective assistance of counsel, courts apply an objective standard of reasonableness to evaluate an attorney's performance. There is a strong presumption that a counsel's performance falls within the wide range of "reasonable professional assistance." Even if counsel's performance does not fall within this great range of reasonableness, a sixth amendment violation is not necessarily established. The error of counsel must have prejudiced the proceeding. "The defendant must show," the *Strickland* court noted, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is," the Court explained, "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

Here, Jones argues that his counsel should have sought a change of venue, should have hired an investigator, and should have interviewed prospective witnesses. It appears that none of Jones' contentions concern errors in professional performance but instead relate to trial strategy. Which witnesses to call at trial and what information to present to the jury are questions that lie within the proper discretion of the trial counsel. Such trial tactics should not be reviewed by an appellate court, which, unlike the counsel, has the benefit of hindsight. Counsel must, after all, have the flexibility to represent a client to the fullest extent possible. *See Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067.

Even if Jones' contentions present errors in professional performance, we can find no prejudice that resulted from the alleged deficiencies. There is no evidence that the local publicity surrounding the trial rendered the proceedings unfair. Indeed, there is no evidence of the extent of the publicity, if any, surrounding the case.

No evidence has been introduced that, had an investigator been hired and/or had certain individuals been interviewed, the result of the proceeding would have been altered. The totality of the evidence before the jury suggests that the result would not have changed. Our own decisions on ineffective-assistance-of-counsel claims suggest the same answer. *See Morgan v. State*, 384 N.W.2d 458 (Minn.1986); *State v. Eling*, 355 N.W.2d 286 (Minn.1984); *Dees v. State*, 292 N.W.2d 564 (Minn.1980). Jones' right to effective assistance of counsel was not violated. His conviction is affirmed.

Affirmed.