*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1825**

State of Minnesota,
Respondent,

vs.

Torisa Sulvoris Wallace,
Appellant.

**Filed November 20, 2023**
**Affirmed**
**Ede, Judge**

St. Louis County District Court
File No. 69VI-CR-22-75

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kimberly Maki, St. Louis County Attorney, Christopher Florey, Assistant County Attorney, Virginia, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Greg Scanlan, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Cochran, Presiding Judge; Johnson, Judge; and Ede, Judge.

**NONPRECEDENTIAL OPINION**

**EDE**, Judge

In this direct appeal from a judgment of conviction for third-degree murder, appellant argues that he is entitled to a new sentencing hearing because (1) he received

ineffective assistance of counsel and (2) the district court abused its discretion in denying his motion for a downward departure. We affirm.

**FACTS**

*Underlying Facts and Charges*

This case arises from appellant Torisa Sulvoris Wallace's involvement in the October 2021 overdose death of Brooke Miller.

Law enforcement learned that, prior to Miller's death, she had contacted K.C. to obtain heroin, and that K.C. had contacted Wallace for assistance. Wallace, Miller, and K.C. met at K.C.'s apartment. Wallace provided narcotics to Miller and left. Police later found Miller dead in her own apartment due to the "toxic effects of fentanyl." Two days after Miller's death, law enforcement searched Wallace and found him in possession of 15.91 grams of fentanyl. According to a sergeant on the scene of the search, the quantity of fentanyl Wallace possessed was greater than a "common user amount[,]" which the sergeant said is 0.1 grams.

Based on the 15.91 grams of fentanyl, respondent State of Minnesota charged Wallace with second-degree drug sale, in violation of Minnesota Statutes section 152.022, subdivision 1(1) (2020), and third-degree drug possession, in violation of Minnesota Statutes section 152.023, subdivision 2(a)(1) (2020). For his role in Miller's death, the state later filed a separate complaint (i.e., the matter underlying this appeal) charging Wallace with one count of third-degree murder, in violation of Minnesota Statutes section 609.195(b) (2020).

2

*Pretrial Proceedings and Plea Agreement*

At Wallace's first appearance, the district court set unconditional bail and continued the matter for a hearing pursuant to Minnesota Rule of Criminal Procedure 8. At the rule 8 hearing, the district court held Wallace without bail due to probation violations in two separate gross misdemeanor files. A month later, Wallace's attorney unsuccessfully argued for a bail reduction. The district court maintained the bail amount in Wallace's third-degree murder case and continued to hold him without bail on his probation violations.

Wallace reached a plea agreement with the state. Wallace agreed to plead guilty to the third-degree murder charge and to admit to probation violations in his two gross misdemeanor files. The state agreed to recommend the presumptive guidelines sentence, to withdraw its motions for aggravated sentencing, and to dismiss Wallace's separate second-degree drug sale and third-degree possession case, in addition to another pending drug possession charge. Lastly, the parties agreed that Wallace could argue for downward departures at sentencing.

At the conclusion of the plea hearing, Wallace's attorney requested that the district court release his client. Counsel stated that he had spoken with Wallace about the potential consequences Wallace could face if Wallace violated his release conditions or the law. This included withdrawal of the plea agreement. Wallace's attorney also asserted that Wallace had a two-year-old son and a job to which he could return upon release:

> He's just really hoping to see his two-year-old son for a few days before he does, most likely, a substantial amount of time at the D.O.C., Your Honor, so we are asking this court to release him. Even if it was just for this weekend or a few days of brief furlough[,] . . . we would beg this court to allow

> Mr. Wallace a few days with his family before he goes to [the] D.O.C. for a substantial amount of time, Judge.

Reiterating this point, Wallace's counsel "implore[d] th[e] court to allow [Wallace] a few days with his young son and his family before he does the D.O.C. time." The state opposed Wallace's request for release, countering that it had substantial public safety concerns and noting that Wallace had a prior fleeing charge from 2020. Regarding the fleeing charge, Wallace's attorney replied that Wallace had returned to his home and contacted his probation officer, which showed "a good faith effort" by Wallace to keep probation apprised of his location. The district court denied Wallace's request for release, maintained bail in the third-degree murder case, and held Wallace without bail in his probation violation matters.

### Sentencing

Prior to sentencing, Wallace's attorney filed a motion for a downward dispositional departure and, in the alternative, for a downward durational departure. At the sentencing hearing, Wallace's attorney maintained that the district court should analyze the case and the departure analysis through a "framework" that included the opioid epidemic. Counsel noted that "the amount of fentanyl that is flooding the U.S. markets and the black market is unparalleled" and that the Centers for Disease Control and Prevention's "quantitative statistics between 2019 and [20]20" show that "opioid overdoses for synthetic drugs . . . increased . . . fifty-six percent." During its sentencing argument, the state similarly referred to the frequency of overdose deaths in the community.

4

In sentencing Wallace, the district court stated that it had heard the sentencing argument of Wallace's attorney and reviewed "all the written submissions[,]" which included the presentence investigation report, the sentencing worksheet, Wallace's motion for departures, Wallace's support letters, and the state's response to Wallace's motion. The district court said that, "before this hearing today, [the court had] sentenced no less than eight people for offenses involving controlled substances and drug-related offenses . . . ." The court continued: "I think we can all agree drugs play a negative role in society. People have lost housing, lost family, lost friends." The district court further stated that the opioid epidemic referenced by both Wallace's attorney and the state's counsel "is not news to anybody" and "[t]he fact that fentanyl is laced in many drugs that are being delivered is not a secret[.]" Observing both that Wallace had sold "drugs to an individual who was vulnerable" because she was "in need of a dose to not feel sick" and that people sought out Wallace as a drug supplier, the court told Wallace: "[W]hen you choose to sell drugs to another individual, you're essentially playing Russian roulette . . . with their lives, and . . . here Ms. Miller's life is lost."

The district court ruled that it could not "find substantial and compelling reasons to depart from the sentencing guidelines[,] either dispositionally or durationally." The court expressly "based [that decision] on [Wallace's] criminal history." In particular, the district court described its review of Wallace's "opportunities at probation in the past" and his involvement in "the criminal justice system for no less than twenty some years[,]" with his "first felony offense dat[ing] back to 2000" and "a recent offense where [he was] sent to prison in 2016." The court noted that Wallace had "an opportunity to be back on probation"

5

but "continu[ed] to sell drugs in the community and . . . this incident occurred." In addition, the district court explained that it could not "take a chance" on Wallace because it would "put a number of people at risk in the public . . . based on the crimes [Wallace] has had against persons, . . . crimes relative to weapons, and prior drug offenses." The court referenced information the state had submitted prior to sentencing that indicated Wallace was attempting to collect drug debts "to post bail" and "improve [his] situation." Lastly, the district court considered deterrence, reasoning that imposing a "sentence that's not presumed by law . . . doesn't send the right message to the community in this situation[.]" Accordingly, the court chose "to follow the sentencing guidelines."

Denying Wallace's request for a departure, the district court sentenced Wallace to 134 months in prison.[1] Wallace appeals.

## DECISION

Wallace seeks a new sentencing hearing, asserting (1) that his attorney's performance at the plea hearing constituted ineffective assistance of counsel and (2) that the district court abused its discretion in denying his downward departure motion at sentencing. The state contends that Wallace's attorney was not ineffective and that the district court did not err in sentencing Wallace. We agree with the state.

---

[1] The district court also imposed concurrent, time-served sentences on Wallace's two admitted gross misdemeanor probation violations, discharging him from probation on those files.

**I.     Wallace's Attorney Did Not Provide Deficient Representation and His Performance Did Not Prejudice Wallace.**

When an appellant raises an ineffective assistance of counsel claim on direct appeal, we analyze that claim under the two-prong *Strickland* test.[2] *See Peltier v. State*, 946 N.W.2d 369, 372 (Minn. 2020) (applying *Strickland*). To meet this test, an appellant must demonstrate that (1) the attorney's representation "fell below an objective standard of reasonableness" and (2) "there was a reasonable probability that, but for [the attorney's] errors, the result of the proceedings would have been different." *Peltier*, 946 N.W.2d at 372 (quotation omitted). When one prong of the *Strickland* test is determinative, we need not address the other prong. *Id.* Generally, we will not review attacks on counsel's trial strategy. *See State v. Nicks*, 831 N.W.2d 493, 506 (Minn. 2013). And we apply a strong presumption that an attorney's "performance falls within the wide range of reasonable professional assistance." *State v. Jones*, 392 N.W.2d 224, 236 (Minn. 1986) (quotation omitted). Claims of ineffective assistance of counsel present mixed questions of law and fact, which we review de novo. *State v. Mouelle*, 922 N.W.2d 706, 715 (Minn. 2019).

**A.     Wallace's representation did not fall below an objective standard of reasonableness.**

As to the first *Strickland* prong, Wallace argues that he received deficient representation because (1) his counsel twice conceded at the plea hearing that Wallace was going to prison and (2) his counsel "allowed" the district court to "unlawfully" hold Wallace without bail on his two gross misdemeanor probation violations. We disagree.

---

[2] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Based on our review of the record, it was objectively reasonable for Wallace's attorney to reference the likelihood of an executed sentence in his argument for a pre-sentencing furlough. Appellate courts "give trial counsel wide latitude to determine the best strategy for the client." *Nicks*, 831 N.W.2d at 506. And there is nothing strategically inappropriate about counsel's argument. Wallace had just pleaded guilty to murder, he was on probation when the incident occurred, and—with a criminal history score of 4—he was facing a presumptive commitment of 134 months. Wallace's attorney acknowledged this context and strategically utilized his client's worst-case scenario in seeking Wallace's release. While discussing Wallace's potential prison sentence, Wallace's counsel noted that Wallace had a job waiting for him, that Wallace had a small child, and that Wallace understood the severity of the consequences he would face if he failed to remain law-abiding. Under these circumstances, imploring the district court to allow Wallace "to see his two-year-old son for a few days before he does, most likely, a substantial amount of time at the D.O.C." is a reasonable strategy.[3]

Likewise, Wallace's counsel did not perform deficiently at the plea hearing by failing to address the hold-without-bail status of his client's two gross misdemeanor

---

[3] Wallace also faults his attorney's release argument for failing to include his amenability to supervision. But we are aware of no authority—and Wallace cites none—requiring such an argument here. That said, Wallace's counsel *did* address his client's amenability to supervision, including by discussing Wallace's "good faith effort" to keep probation informed of his location following the 2020 fleeing incident and by explaining Wallace's awareness of the consequences he faced if he returned to criminal conduct on release. In addition, had the district court granted the requested pre-sentencing furlough, Wallace's attorney could have referenced his client's commitment to his two-year-old son and return to employment as evidence of amenability in support of his departure motion, regardless of the furlough's length.

probation violations. Although Wallace points out that he had served close to two-thirds of both potential revocation sentences at the time of the plea hearing, he disregards the district court's discretion to impose consecutive revocation sentences. *See* Minn. Stat. § 609.15, subd. 1(b) (2020). And regardless of Wallace's probation holds, the district court was entitled to hold Wallace without bail on the third-degree murder charge to which he had just pleaded guilty. *See* Minn. R. Crim. P. 27.01 ("After conviction but before sentencing, the court may continue or alter the terms of release, or the court may confine the defendant."). In any case, although Wallace's attorney did not directly address the hold-without-bail status of the probation violations, his argument for Wallace's outright release effectively requested that the court lift the holds.

In sum, given our deference to counsel's strategic decisions, Wallace's representation did not fall below an objective standard of reasonableness.

### B. There was no reasonable probability that, but for the conduct of Wallace's attorney, the result of the proceedings would have been different.

Regarding the second *Strickland* prong, Wallace maintains that his attorney prejudiced his motion for sentencing departures by discussing his potential prison sentence at the plea hearing. We are not persuaded.

Given our foregoing conclusion that defense counsel's performance did not fall below an objective standard of reasonableness, we need not address the prejudice prong. *See Peltier*, 946 N.W.2d at 372. That said, there was no reasonable probability that—but for counsel's performance—the result of Wallace's sentencing would have been different.

9

This is because the district court did not deny Wallace's motion based on the arguments Wallace's counsel advanced at the plea hearing. Instead, after listening to the sentencing argument of Wallace's attorney and reviewing "all the written submissions[,]" the district court set forth explicit bases for its determination that it could not "find substantial and compelling reasons to depart from the sentencing guidelines[,] either dispositionally or durationally[,]" none of which included any concessions by Wallace's attorney. The court cited Wallace's criminal history as its primary basis, including: (1) his previous poor performance on probation; (2) his involvement in the criminal justice system for more than twenty years; (3) his commission of the underlying offense while under supervision; and (4) the threat to public safety posed by the types of offenses Wallace had committed (e.g., crimes against persons, weapons crimes, and prior drug offenses). The court also relied on information the state had provided that evidenced an attempt by Wallace to collect drug debts for bail money. Finally, the court grounded its denial of Wallace's motion in its concern for general deterrence, favoring a guidelines sentence to "send the right message to the community[.]"

Based on our review of the record, there is no indication that the district court declined to depart from the guidelines based on what Wallace's attorney had argued at the plea hearing. Wallace has therefore failed to demonstrate a reasonable probability that, but for his attorney's conduct, the result of his sentencing proceeding would have been different.

**II.      The District Court Did Not Abuse Its Discretion in Sentencing Wallace.**

A district court must impose a sentence within the Minnesota Sentencing Guidelines' presumptive range unless it finds substantial and compelling circumstances to depart. *See State v. Barthman*, 938 N.W.2d 257, 270 (Minn. 2020). "Substantial and compelling circumstances" are circumstances that make the facts of a particular case distinct from a typical case. *Taylor v. State*, 670 N.W.2d 584, 587 (Minn. 2003). If a district court finds such circumstances exist, it *may* but is not *required* to depart from the presumptive sentence. *See Wells v. State*, 839 N.W.2d 775, 781 (Minn. App. 2013), *rev. denied* (Minn. Feb. 18, 2014). The district court is not required to give an explanation when the court considers reasons for departure but nevertheless imposes a presumptive sentence. *See State v. Musse*, 981 N.W.2d 216, 220 (Minn. App. 2022), *rev. denied* (Minn. Dec. 28, 2022). We will affirm a presumptive sentence if the record demonstrates that "the sentencing court carefully evaluated all the testimony and information presented before making a determination." *State v. Johnson*, 831 N.W.2d 917, 925 (Minn. App. 2013) (quotation omitted), *rev. denied* (Minn. Sept. 17, 2013). We review a district court's decision not to depart from the sentencing guidelines for an abuse of discretion. *See State v. Oberg*, 627 N.W.2d 721, 724 (Minn. App. 2001), *rev. denied* (Minn. Aug. 22, 2001).

**A.      The district court did not abuse its discretion by considering evidence outside the record or by making findings not supported by the record.**

Citing *State v. Dorsey*, 701 N.W.2d 238 (Minn. 2005), Wallace contends that the district court violated his right to an impartial judge by erroneously sentencing him based

11

on evidence outside the record and by making unsupported findings. Wallace's arguments are unavailing.

In his principal brief, Wallace argues that the district court "expressly relied" on facts not in the record by referring to information that Wallace was attempting to collect drug debts for bail money, which the state submitted prior to sentencing. But in his reply brief, Wallace concedes that the information the court referenced was included in an exhibit the state had filed in the Minnesota Digital Exhibit System (MNDES).[4] Nonetheless, Wallace maintains—without citation to supporting legal authority—that the exhibit's content reaches beyond the hearsay statements normally considered by district courts at sentencing. Contrary to Wallace's argument, the Minnesota Rules of Evidence, other than those with respect to privileges, do not apply to sentencing hearings. *See* Minn. R. Evid. 1101(b)(3).

Wallace also claims that the district court was "plainly influenced" by evidence outside the record, namely, the other drug cases the court heard prior to Wallace's sentencing hearing. Wallace relies on *Dorsey* in asserting that an impartial proceeding requires that district courts base their conclusions only on facts in evidence and not extra-record matters. Although *Dorsey* discussed the "impartial judge" rule in the context of a bench trial, we have, in nonprecedential opinions, extended the rule to sentencing hearings. *See, e.g., State v. Leckner*, No. A19-1007, 2020 WL 3172651, at *3 (Minn. App. 2020);

---

[4] This digital exhibit is not included in the record on appeal. We note this only to underscore the importance of uploading digital exhibits prior to hearings so that the district court can record its rulings on admissibility in MNDES and, where appropriate, ensure that digital exhibits become part of the record on appeal.

12

*State v. Knopik*, A22-0766, 2023 WL 193989, at *5 (Minn. App. 2023), *rev. denied* (Minn. Mar. 28, 2023). But the district court did not rely on evidence outside the record in sentencing Wallace. The court did mention at the outset of its ruling that it had previously sentenced eight or more people for offenses that involved controlled substances. This comment, however, was brief and responsive to arguments by both Wallace's attorney and the state regarding the effects of drugs on the community-at-large. After the district court's reference to the other cases it had heard that day, the court discussed the specifics of Wallace's case and did not rely on those other cases during its detailed statement of the bases for Wallace's sentence.

Wallace also asserts that the district court made findings not supported by the record by stating that Wallace continued to sell drugs while on probation, implying without evidence that Wallace had a prior history of narcotics trafficking. The record before the district court did establish, however, that Wallace had a conviction for selling a simulated controlled substance before he engaged in the conduct underlying the present offense. Moreover, in this case, K.C. had contacted Wallace for help obtaining drugs for Miller. The fact that K.C. believed Wallace would have drugs for Miller to purchase indicates that Wallace was known to sell narcotics and supports a reasonable inference that Wallace had done so in the past. In addition, two days after Wallace sold drugs to Miller—while Wallace remained on probation in his two gross misdemeanor cases—police found him in possession of 15.91 grams of fentanyl, which a sergeant described as more than a common amount for personal use. The district court's statement about Wallace's continued sale of drugs had ample support in the record.

13

Finally, Wallace claims that the district court had no basis for imputing knowledge to him about the effects of fentanyl and its presence in street drugs, including in a substance he believed was heroin. The record does not indicate that the district court expressly imputed knowledge to Wallace. Instead, the court noted that, because it "is not a secret" that "fentanyl is laced in many of the drugs that are delivered[,]" when drug dealers "choose to sell drugs to another individual," they are "essentially playing Russian roulette . . . with their lives and . . . here Ms. Miller's life is lost." This does not necessarily suggest that the court imputed knowledge to Wallace that he knew that the drugs he sold Miller were fentanyl, just that such a risk is generally well-known. And the district court's comment was responsive to the sentencing argument by Wallace's attorney, who requested that the court consider the offense through the lens of the opioid epidemic. But even assuming without deciding that the district court's statement did impute knowledge to Wallace, the fact that law enforcement discovered Wallace in possession of 15.91 grams of fentanyl just a couple days after his sale to Miller supports a reasonable inference of knowledge. More fundamentally, we disagree with Wallace because the court's specific articulation of the reasons for his sentence did not include any reference to his knowledge that the drugs he sold to Miller were fentanyl.

We therefore conclude that the district court did not abuse its discretion because it did not sentence Wallace based on evidence outside the record and it did not make unsupported findings.

**B.** **The district court did not abuse its discretion in its consideration of Wallace's motion for a durational departure.**

Wallace argues that, by engaging in a "limited discussion" of his requested durational departure, the district court failed to deliberately consider the factors he asserted in support of his motion. More specifically, Wallace contends that the district court said very little about whether he had a minor role in the crime, treated his case generally rather than addressing his specific conduct, and did not sufficiently consider whether the offense was less serious than others of its nature. The record defeats these contentions.

"A durational departure must be based on factors that reflect the seriousness of the offense, not the characteristics of the offender." *State v. Solberg*, 882 N.W.2d 618, 623 (Minn. 2016) (citing *State v. Chaklos*, 528 N.W.2d 225, 228 (Minn. 1995)). Downward durational departures are justified only when a defendant's conduct was "significantly less serious than that typically involved in the commission of the offense." *Id*. at 624 (quotation omitted).

Here, the district court prefaced its sentencing ruling with an acknowledgment that it had heard the argument of Wallace's attorney and had reviewed "all the written submissions[.]" Those submissions necessarily included the presentence investigation report, the sentencing worksheet, Wallace's motion for departures, Wallace's support letters, and the state's response to Wallace's motion. In particular, Wallace's motion asserted that "the circumstances surrounding the [drug] transaction provide mitigation for a durational departure[,]" including the fact that it was K.C. who had arranged the narcotics sale that led to Miller's death. Because the district court reviewed Wallace's motion, the

15

court considered Wallace's role versus that of K.C. in determining the appropriate sentence.

In addition, although the district court was not required to give an explanation when it considered Wallace's departure motion but nevertheless chose to impose a presumptive sentence, *Musse*, 981 N.W.2d at 220, the court *did* discuss the bases for its decision not to depart. For example, the court explained that, in facilitating Miller's purchase, K.C. specifically sought out Wallace as an individual who could provide the drugs Miller wanted and that Wallace sold those drugs to a vulnerable individual. The court also stated that Wallace essentially played "Russian roulette" by selling narcotics because—even if Wallace was unaware that the drugs contained fentanyl—he risked providing a fatal substance to Miller, and Wallace's sale did result in Miller's death. Given that these factors reflect the seriousness of the offense, the district court did not abuse its discretion in declining to depart based on its determination that Wallace's conduct was not "significantly less serious than that typically involved in the commission of the offense." *Solberg*, 882 N.W.2d at 624 (quotation omitted).

Because the record reflects that "the sentencing court carefully evaluated all the testimony and information presented before making a determination[,]" we affirm the district court's imposition of a presumptive guidelines sentence in this case. *Johnson*, 831 N.W.2d at 925 (quotation omitted).

**Affirmed.**