STATE of Minnesota, Respondent,

v.

Nidjia Dean NICKS, Appellant.

Nos. A09–1641, A12–0348.

Supreme Court of Minnesota.

May 31, 2013.

David W. Merchant, Chief Appellate Public Defender, Rachel F. Bond, Assistant State Public Defender, Saint Paul, MN, for appellant.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Elizabeth Johnston, Assistant Hennepin County Attorney, Minneapolis, MN, for respondent.

OPINION

ANDERSON, Paul H., Justice.

Nidjia Dean Nicks was convicted by the Hennepin County District Court of first-

degree murder in the shooting death of Johanna Hollis and of the attempted first-degree murder of Hollis's daughter, A.R. At trial, the State was only able to present a minimal amount of direct evidence that connected Nicks to the scene of the shooting. Thus, the State had to rely primarily on circumstantial evidence that included certain cellphone records. The records indicated that Nicks was in the vicinity of the shooting and supported the assertion by two witnesses that Nicks made threats to Hollis during a cellphone call Nicks placed to Hollis at 12:11 a.m. on the night of the shooting. Nicks's cellphone records indicate that he placed two calls to Hollis's cellphone at 12:11 a.m. Nicks has consistently maintained that those two calls went to Hollis's voicemail, that he did not speak with Hollis that night, and that no threatening calls between him and Hollis occurred. Nicks's trial counsel requested the records for Hollis's cellphone from her service provider; but counsel did not correctly interpret the provider's response to the request and did not take further steps to obtain the records.

Following trial, Nicks filed a direct appeal with our court. While the direct appeal was pending, Nicks's appellate counsel retained a forensic expert to conduct an examination of Hollis's cellphone. Nicks alleges that this forensic examination revealed that Hollis could not have received the alleged threatening phone calls from his cellphone. After obtaining this information, Nicks's appellate counsel sought a stay of the direct appeal and petitioned for postconviction relief. The postconviction court denied Nicks's petition without an evidentiary hearing, and Nicks now brings both the direct appeal and the postconviction appeal to our court. On appeal, Nicks primarily alleges is that his trial counsel provided ineffective assistance because counsel failed to obtain Hollis's cellphone records and failed to conduct a forensic examination of Hollis's cellphone. Because we conclude that Nicks has met the threshold showing required to receive an evidentiary hearing on his ineffective-assistance-of-counsel claim, we reverse the postconviction court and remand for an evidentiary hearing.

On March 2, 2008, Johanna Hollis was shot dead and her daughter, A.R., was grazed by a bullet after an assailant fired 16 shots into their south Minneapolis home. Several of Hollis's children lived with her, as did other relatives and acquaintances, including T.H., S.H., and S.H.'s girlfriend, V.T. For a period of time, a young woman named M.G. also lived with Hollis because both of M.G.'s parents were deceased and M.G. had a young daughter to care for. The Hollis children and M.G. were socially acquainted with the defendant, Nidjia Dean Nicks. In spring 2008, M.G. began dating Nicks and moved out of the Hollis home to live with Nicks. M.G. subsequently moved to a hotel room that Nicks rented for her in Brooklyn Center.

The relationship between the Hollis children and Nicks became antagonistic, largely because of an altercation between Nicks and V.T. The Hollis children believed that Nicks operated a prostitution ring and that he had been exploiting M.G. by making her work for him as a prostitute. This belief was upsetting to the Hollis family. The Hollis children also believed that Nicks was angry with V.T. because V.T.—who was 17 at the time of the shooting—"wouldn't have sexual contact" with him, or that Nicks had wanted V.T. to work for him as a prostitute and he was angry when she refused to do so.

Nicks's and M.G.'s testimony provided differing accounts of their relationship. According to Nicks and M.G., discord in the relationship between Nicks and V.T.

began after Nicks and M.G. had been out socializing with V.T. Nicks stated that he offered to take both M.G. and V.T. home following several hours of partying, but both women wanted to continue to socialize. Later, V.T. asked Nicks for a ride home and grew upset when Nicks refused. Nicks testified that he did not want to drive her home because he had been drinking and was intoxicated. V.T. then called various family members and told them that Nicks was "holding her against her will" and "holding her hostage." Nicks testified that because V.T. was so upset he eventually agreed to give her a ride home.

Nicks and M.G. both said that during the ride home V.T. became physically violent and began striking Nicks. This led Nicks to pull over to the side of the road and force V.T. to get out of his vehicle. Nicks also got out of the vehicle and, after he did so, V.T. continued to strike him. Nicks shoved V.T., causing her to fall over on the ground. Nicks then left the scene and V.T. had to walk the remaining six or seven blocks to her home.

The foregoing incident led to a confrontation on the day before the shooting between Nicks and S.H., who was V.T.'s boyfriend. S.H. was upset with Nicks because of the earlier altercation between Nicks and V.T. On the day in question, Nicks was driving past the Hollis home when S.H. recognized Nicks's vehicle. Although S.H. had never met Nicks, he went outside and told Nicks he had "a couple of questions," so Nicks parked his vehicle and got out. S.H. testified that when he went outside after seeing Nicks's vehicle, it was to "probably fight" Nicks. According to T.H., who witnessed the incident, Nicks responded to S.H.'s inquiries by acting in a threatening manner. S.H. then backed away and went back inside the Hollis home. According to S.H., Nicks said, "I don't play no games, you little boy," and acted as if he had a gun. No witness actually saw a weapon.

S.H. testified that this incident happened at night, but T.H. testified it was during the daytime. The nature, duration, and lighting during this confrontation are significant because the incident was the only interaction between S.H. and Nicks before the shooting of Hollis and her daughter, and the interaction later served as the sole basis for S.H. to testify that he knew who Nicks was and saw him fleeing the scene of the shooting.

On the evening of March 1, a few hours before the shooting, a group of eight individuals, including T.H., S.H., and several friends, went to M.G.'s room at the Brooklyn Center hotel. The stated purpose of this visit was to find a man named Gari and physically attack him due to an unrelated dispute. The group did not know that Nicks sometimes stayed with M.G. at the hotel and that Nicks kept several of his belongings there. After arriving at the hotel, T.H. called M.G. and demanded to be allowed to enter her room. M.G. allowed the group into her room and their subsequent search of the room did not result in finding Gari. Nevertheless, members of the group stole a cellphone, laptop, and some clothing, and urinated on some other clothing in the room. The cellphone stolen by the group belonged to M.G. and the laptop belonged to Nicks. Both Nicks and M.G. testified that Nicks let M.G. use the laptop. By some accounts, the laptop was infected with several computer viruses and was barely operable. There is a dispute over how Nicks and M.G. used the laptop. Nicks and M.G. assert that the laptop had several photos and other personal data on it; the State asserts that the laptop was used by Nicks in his alleged prostitution business.

Following the incident at the hotel, M.G. called Johanna Hollis and told her what

had happened. Hollis told M.G. that she "didn't want nothing to do with it," so M.G. hung up and called Nicks. Nicks was upset when he heard the news about the theft and vandalism of his possessions. M.G. then repeatedly placed calls to members of the Hollis family in an attempt to get the items returned. One of the phones that M.G. placed calls to was her own cellphone—which the group had taken. M.G. also repeatedly called Nicks, who sometimes answered and sometimes did not. M.G. testified that Nicks sounded quite intoxicated during their conversations.

Some of the group that vandalized M.G.'s hotel room, including the Hollis family members, returned to the Hollis home with the stolen items. J.B., a friend of the Hollis family and of M.G., was at the home to visit with Johanna Hollis. J.B. testified that at the time he was smoking marijuana and was "buzzed." Hollis family members and J.B. testified that sometime after the group returned from the hotel, Johanna Hollis received a threatening call or calls that greatly upset her. J.B. testified that he recognized Nicks's voice on the other end of the phone and that he heard Nicks tell Johanna Hollis: "[I]f I don't get that laptop and cellphone back I'm going to come and kill everybody in that mother fucking house." At trial, J.B. testified that he was not sure which cellphone the threatening phone call was received on—Johanna Hollis's or M.G.'s— and acknowledged that he had suffered a head injury that affected his short term memory. J.B. also testified that following the alleged threatening phone calls he asked Johanna Hollis if she would be all right and she said she would be "fine." J.B. then left the Hollis home and locked the front door on his way out.

At approximately 1:17 a.m. on March 2, 2008, 16 bullets were fired through the front door and living room window of the Hollis home, killing Johanna Hollis and injuring her daughter, A.R. Following the shooting, several occupants of the home fled out the back door toward an alleyway that abutted the rear of the home. S.H. testified that as he ran down the alley he saw a man running away from the scene. S.H. first provided a description of the man to the police officers who responded to the shooting, but did not specifically identify the man to the police. Later, S.H. told the police that he recognized the man as the same person he had confronted in front of the Hollis home the day before, although he did not know the man's name.

The police and paramedics who responded to a 911 call placed by T.H. began their investigation immediately upon arrival at the scene. T.H. gave a statement to the police in which she recounted what had happened that night and said that two different suspects came to mind. She said that the shooting could have been perpetrated either by Nicks or by K.C., who was T.H.'s on-again, off-again boyfriend. T.H. said that K.C. had recently threatened to shoot at the Hollis home or vehicles if he ever saw the vehicle of T.H.'s current boyfriend outside of the Hollis home. The vehicle identified as belonging to T.H.'s current boyfriend was parked outside the home on the night of the shooting. T.H. stated that both Nicks and K.C. were involved in narcotics and that K.C. "was a drug dealer."

During her first interview with the police, T.H. did not mention the hotel incident or the alleged threatening phone calls between her mother and Nicks. T.H. gave a second statement at the scene. In that second statement, she mentioned Nicks and the conflict between him, M.G., V.T., and S.H. During this second interview, T.H. also named K.C. as a possible suspect and described the threats that K.C. had

made. Based on the statements of S.H. and T.H., the police focused their investigation on Nicks. After locating Nicks at the Brooklyn Center hotel, the police arrested him there early that morning.

Nicks's whereabouts around the time of the shooting are disputed. During a telephone call that he placed from jail—a recording of which was introduced at trial to impeach Nicks's credibility—Nicks originally said that he could not have committed the murder because he was in north Minneapolis at that time. Cellphone-tower records introduced at trial show that between 11:15 p.m. and approximately 1:30 a.m. Nicks traveled from north Minneapolis to south Minneapolis, was in the vicinity of the shooting at about the time it took place, and then returned to north Minneapolis.

At trial, Nicks testified about his whereabouts that night. Nicks testified that sometime after 9:00 p.m., he met up with his brother N.B. at their aunt's home in north Minneapolis so that Nicks could lend N.B. his vehicle. The cellphone-tower evidence offered at trial places Nicks in the vicinity of his aunt's home in north Minneapolis at that time. Nicks testified that he then went to a friend's home and used her vehicle to continue to socialize with friends, eventually meeting up with his cousin D.J. at about 11:00 p.m. Nicks testified that N.B. called Nicks several times around 12:30 a.m. to tell Nicks that N.B. was done with Nicks's vehicle. Nicks testified that he did not receive those calls because the battery on his cellphone had died and he was recharging it. N.B.'s cellphone records reflect the calls N.B. made to Nicks around 12:30 a.m. N.B. also called D.J. At that time, both D.J. and Nicks were at Nicks's aunt's home in north Minneapolis. Nicks drove to N.B.'s home, which was located about three blocks from the Hollis home, leaving north Minneapolis at about

12:45 a.m. Nicks called N.B. to let him know that he was driving down the block and on his way to pick up his vehicle. Both Nicks's and N.B.'s cellphone records indicate a call between Nicks and N.B. occurred at 1:09 a.m. Nicks testified that when he was at N.B.'s home he used the bathroom and retrieved his vehicle. He left N.B.'s home in his vehicle while D.J. drove the vehicle that Nicks had borrowed from his female friend. Nicks received a 5-minute call from the Brooklyn Center hotel at 1:17 a.m., and called his female friend at 1:28 a.m. to tell her that he was on his way to return her vehicle. Nicks eventually returned to the Brooklyn Center hotel around 2:30 a.m. One of the witnesses who testified at trial with respect to Nicks's alibi later recanted his testimony and testified that he had been pressured on behalf of Nicks to fabricate his testimony.

From the beginning of their investigation, the police focused on the telephone records of several key participants in the events surrounding the shooting. On March 4, Sergeant Erick Fors, one of the lead homicide investigators working on the case, went to the Brooklyn Center hotel to obtain the telephone records for M.G.'s room. On March 5, Sergeant Chris Gaiters gave Fors the records of Nicks's cellphone usage. These records also helped the police investigators use the cellphone-tower information to track Nicks's movements on the night of the murder. On March 7, Fors faxed search warrants to several cellphone service providers in order to obtain cellphone records for M.G., Nicks's brother N.B., and Johanna Hollis. M.G. had service from Verizon, N.B. had service from T–Mobile, and Hollis had service from Sprint. Verizon responded on March 13 with the records for M.G.'s cellphone and T–Mobile responded on March 20 with the records for N.B.'s cellphone. By April 28, Fors had not received a re-

sponse from Sprint with the information about Hollis's cellphone, so Fors forwarded an administrative subpoena to Sprint. Sprint responded to the administrative subpoena on May 8. In the course of Nicks's subsequent postconviction proceedings, the postconviction court found that Sprint's response contained "information that [Johanna Hollis's] phone number belonged to a Sprint reseller, Virgin Mobile, and that Sprint only maintained a 60–day record detail of reseller accounts." The postconviction court found that the "response noted that Virgin Mobile would retain [its] own customer information and account details." Neither Fors nor Gaiters followed up with Virgin Mobile about obtaining Hollis's cellphone records. The records that the police obtained from Nicks, his brother N.B., and from M.G.'s cellphone and the landline at the Brooklyn Center hotel revealed that they and the Hollis family had significant telephone contact with each other in the days before the shooting and around the time of the shooting.

When a telephone call is placed to a cellphone or a cellphone user places a call on his or her phone, a cellphone tower near the receiving or placing cellphone will be activated to help route the call. Therefore, the police looked at the telephone records to determine which cellphone towers had been activated to route certain cellphone calls. They did this in order to try to find Nicks's approximate location around the time of the shooting. The cellphone-tower records indicated that just after 11:00 p.m., Nicks had been near Fridley; he then proceeded to the Golden Valley area until sometime after midnight; then traveled to south Minneapolis at around 1:00 a.m., near the location of the Hollis home; and he then returned to the north Minneapolis/Golden Valley area.

Nicks's cellphone records showed that he had placed two calls to Johanna Hollis's cellphone at 12:11 a.m. on the morning of the shooting. This record corroborated the eyewitness account of the Hollis family members who reported overhearing one or two threatening calls between Nicks and Johanna Hollis at about that time. The telephone records also showed that Nicks had received a 5–minute call from the Brooklyn Center hotel at 1:17 a.m., which is the time that eyewitnesses reported that the shooting occurred. The police conducted a forensic examination of Nicks's cellphone to determine what information was contained in the phone. The police determined that Nicks had deleted a block of calls that occurred around the time of the shooting, including any record of the 12:11 a.m. calls to Johanna Hollis's cellphone.

On April 3, 2008, a Hennepin County grand jury indicted Nicks on one count of first-degree murder, one count of second-degree murder, and one count of attempted first-degree murder. The grand jury indictment was amended on March 16, 2009, to include an aiding and abetting theory on each count. A jury trial was held in late May and early June 2009.

During voir dire on May 21, 2009, Nicks's trial counsel made a "special discovery request" to the district court for Johanna Hollis's cellphone records. The State replied that it did not believe it had the records, but agreed to check to see if it did. The State also expressed its concern that issuing a subpoena for the records at such a late date would extend into the time set for the trial. Nicks's counsel replied that "there was a reason to get" the records and that "there still is a reason to get them." Counsel went on to state that the records were

something that [the State] should have given me in the beginning. You have just

one side of these conversations. I think [Johanna Hollis's] records will show who she was talking to or who she wasn't talking to and I think it's very relevant and it should have been disclosed earlier.

The court suggested and the parties agreed that the State would check to see whether it had the records at that time and report back to the court and Nicks. Five days later on May 26, the State informed the court and Nicks that it did not have the requested phone records. The record indicates there was some confusion that the State may have thought Nicks's counsel was requesting T.H.'s cellphone records rather than Johanna Hollis's. The State informed the court and Nicks that an administrative subpoena had been submitted to the cellphone service provider to obtain the records.

During the May 26 discussion, Nicks's trial counsel provided an additional reason why he wanted to have Johanna Hollis's cellphone records: counsel told the district court that the State had recently informed him that it had a second witness who would testify about overhearing the alleged threatening phone calls between Nicks and Hollis. Originally, the State had listed J.B. as the only potential witness with respect to the 12:11 a.m. phone calls. Nicks's trial counsel told the court that he was prepared to challenge J.B. about his recollection of the phone calls because J.B. was an easily impeachable witness. But counsel asserted that the new, previously undisclosed testimony by a second witness changed the situation and rendered access to the complete phone records more critical to Nicks's defense. In response to counsel's assertions, the State agreed to attempt to obtain Johanna Hollis's cellphone records and asked Nicks's counsel if, in the absence of the cellphone records, he would ask for a continuance. Nicks's counsel said that he would not. The cellphone records were never obtained and any response to the 2009 administrative subpoena is not in the record. In lieu of the cellphone records, Nicks's trial counsel did not request a forensic examination of Hollis's cellphone. At trial, both J.B. and T.H. testified that they heard Nicks call and threaten Hollis.

At some point during the course of the trial, Nicks's trial counsel became convinced that Johanna Hollis's cellphone records had been destroyed and were not available. During counsel's cross-examination of Sergeant Fors about the various phone records, the following exchange occurred:

**Nicks's counsel:** But [the State] don't have no proof [that the threatening phone calls occurred].

**The Court:** The proof can be either direct testimony which they've got or it can be [the records]. They also said that the records were destroyed after two months. So I mean there's—you know, the phone company said they didn't have them anymore.

**Nicks's counsel:** Okay. I'll deal with that.

**Nicks's counsel [to Fors]:** Now, you told us that the phone company said the records were destroyed after two months; right?

**Fors:** If that's what the response says, that they didn't respond with the records that I requested.

During trial, Nicks acknowledged that on the night of the shooting, he had tried to call Johanna Hollis's cellphone. He said he called Hollis's cellphone either to reach her or another family member in order to talk about the stolen items. He went on to testify that he never spoke with Hollis and the calls went straight to Hollis's voicemail. At trial, Nicks was able to accurately describe Hollis's voicemail greeting.

During trial, the State acknowledged that two 1–minute phone calls are consistent with two calls being sent to voicemail.

The jury found Nicks guilty of first-degree premeditated murder and attempted first-degree murder. The district court subsequently convicted Nicks on both charges and sentenced him to life in prison without the possibility of release for first-degree murder and a concurrent sentence of 240 months for attempted first-degree murder.

On September 8, 2009, Nicks commenced a direct appeal of his convictions and also petitioned the postconviction court for a new trial based on a claim of ineffective assistance of trial counsel. At Nicks's request, we stayed his direct appeal so the district court could consider his postconviction petition. As part of his postconviction appeal, Nicks's appellate counsel requested a forensic examination of Johanna Hollis's cellphone. The examination was conducted on February 22, 2011, by the Minneapolis police and observed by a forensic expert retained by Nicks. That examination indicated that Hollis did not receive any phone calls from Nicks's cellphone on the night of the shooting. In response to this forensic examination, Sergeant Fors opined that the post-trial forensic examination had not been as thorough as it could have been and that it was still possible the 12:11 a.m. phone calls had been received by Hollis. But the State now acknowledges that "prosecutors guessed" that the two 12:11 a.m. calls from Nicks's cellphone were the source of the threatening phone calls that are alleged to have taken place.

After obtaining the results of the forensic examination of Johanna Hollis's cellphone, Nicks made two main assertions in his postconviction appeal: (1) that he had received ineffective assistance of trial counsel because his counsel had failed to have Johanna Hollis's cellphone examined or to obtain her cellphone records; and (2) that the new cellphone-record evidence showed a violation of the Due Process Clause of the Fourteenth Amendment. More specifically, Nicks asserted that he was convicted on the false testimony of two witnesses who testified that they overheard the alleged threatening phone conversations between Nicks and Johanna Hollis—conversations that Nicks alleges the record shows did not occur. Nicks requested a new trial or an evidentiary hearing to consider his ineffective-assistance claim in light of the new cellphone evidence.

On December 28, 2011, the postconviction court denied Nicks's petition without an evidentiary hearing. With respect to Nicks's ineffective-assistance-of-counsel claim, the court concluded that Nicks had not alleged facts sufficient to meet the two-prong test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The court concluded that, once Nicks had requested Johanna Hollis's cellphone records, counsel may not have had time to obtain the records before trial and that counsel succeeded in impeaching the two witnesses who testified about the alleged threatening phone calls. In addition, the court concluded that there was sufficient evidence for the jury to convict Nicks without the cellphone-call evidence, and so the failure to obtain Johanna Hollis's cellphone records did not prejudice Nicks.

On Nicks's second postconviction claim—false testimony of witnesses—the postconviction court concluded that it was not reasonably well satisfied that the witnesses provided false testimony, that Nicks had not shown that the jury would have reached a different result without the testimony, and that Nicks had not shown he was "surprise[d]" by the allegedly false

testimony. The court then noted that Nicks and his trial counsel had taken "the position from the start of trial" that the testimony about threatening phone calls from Nicks to Johanna Hollis was false.

On February 27, 2012, Nicks moved to reinstate his direct appeal and we granted the motion. The cases before us represent a consolidation of Nicks's direct appeal and an appeal of the postconviction court's summary denial of Nicks's petition for a new trial. Nicks raises five issues: (1) the ineffective assistance of counsel issue related to his trial counsel's failure to either correctly read Sprint's response to the subpoena or to request an examination of Johanna Hollis's cellphone; (2) the forensic examination of Johanna Hollis's cellphone means that Nicks was convicted using false testimony; (3) the district court erred by admitting evidence that Nicks ran a prostitution business and was a pimp; (4) alleged prosecutorial misconduct; and (5) "numerous, serious errors" that warrant a new trial in the interests of justice. Nicks also filed a supplemental pro se brief, which raises both overlapping and additional claims.

## I.

 When reviewing a postconviction court's summary denial of relief under Minn.Stat. § 590.04 (2012), we have an "obligation to extend a broad review of both questions of law and fact." *Butala v.*

*State,* 664 N.W.2d 333, 338 (Minn.2003) (citation omitted) (internal quotation marks omitted); *accord Dobbins v. State,* 788 N.W.2d 719, 725 (Minn.2010). The scope of our review of factual matters is to determine whether there is sufficient support in the record to sustain the postconviction court's findings. *Dobbins,* 788 N.W.2d at 725; *accord Riley v. State,* 819 N.W.2d 162, 167 (Minn.2012). The court's factual findings will not be disturbed unless they are clearly erroneous. *Riley,* 819 N.W.2d at 167. We review the court's legal conclusions de novo. *Id.; see also State v. Ferguson,* 742 N.W.2d 651, 659 (Minn.2007). Ultimately, we review a denial of a petition for postconviction relief, including a denial of relief without an evidentiary hearing, for an abuse of discretion. *Davis v. State,* 784 N.W.2d 387, 390 (Minn.2010). A postconviction court "abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Riley,* 819 N.W.2d at 167 (citation omitted) (internal quotation marks omitted). Because claims of ineffective assistance of counsel are mixed questions of law and fact, we review the postconviction court's legal conclusions on such questions de novo.[1] *Opsahl v. State,* 677 N.W.2d 414, 420 (Minn.2004); *see also State v. Rhodes,* 657 N.W.2d 823, 842 (Minn.2003). Therefore, when we review a postconviction court's denial of relief on a claim of ineffec-

---

1. On several occasions, the dissent characterizes the postconviction court's statements regarding defense counsel's trial strategy as factual findings, but the dissent does not cite case law to support that characterization. Based on its erroneous characterization of the postconviction court's statements, the dissent claims the statements are owed deference by our court. What constituted trial strategy and its relationship to the adequacy of representation are not findings, but mixed questions of law and fact, which we review de novo. *See Opsahl,* 677 N.W.2d at 421 ("Be-

cause Opsahl only challenges his counsel's defense strategy, we will not challenge the district court's *conclusion* that counsel provided 'most adequate' representation." (emphasis added)). Because the postconviction court's statements regarding what constitutes trial strategy and its relationship to the adequacy of representation are more accurately characterized as mixed questions of law and fact, the statements are not owed deference by our court and are instead reviewed de novo.

tive assistance of counsel, we will consider the court's factual findings that are supported in the record, conduct a de novo review of the legal implication of those facts on the ineffective assistance claim, and either affirm the court's decision or conclude that the court abused its discretion because postconviction relief is warranted.[2]

Nicks claims that the postconviction court erred when it failed to grant him a new trial on his claim of ineffective assistance of counsel. Alternatively, Nicks claims that the court erred when it failed to grant him an evidentiary hearing regarding his ineffective assistance claim. We have held that, "[t]o receive an evidentiary hearing on a postconviction claim of ineffective assistance of . . . counsel, a defendant is required to allege facts that, if proven by a fair preponderance of the evidence, would satisfy the two-prong test announced in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *Bobo v. State,* 820 N.W.2d 511, 516 (Minn.2012); *see also Scruggs v. State,* 484 N.W.2d 21, 25 (Minn. 1992). The two prongs of the *Strickland* test are: (1) the defendant must prove that counsel's representation fell below an objective standard of reasonableness; and (2) the defendant must prove there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687–96, 104 S.Ct. 2052. We conclude that Nicks has not yet shown that he is entitled to a new trial under *Strickland.*

But the Legislature has established the threshold for defendants to meet before postconviction courts must grant an evidentiary hearing. *See* Minn.Stat.

§ 590.04. Importantly, as we have stated several times before, "[t]he showing required for an evidentiary hearing is lower than that required for a new trial." *Bobo,* 820 N.W.2d at 516 (citing *Opsahl,* 677 N.W.2d at 423). The standard for granting a postconviction evidentiary hearing is set forth in section 590.04, subdivision 1, which states:

Unless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief, the court shall promptly set an early hearing on the petition and response thereto, and promptly determine the issues, make findings of fact and conclusions of law with respect thereto, and either deny the petition or enter an order granting appropriate relief.

Minn.Stat. § 590.04, subd. 1. Any doubts about whether to conduct an evidentiary hearing should be resolved in favor of the defendant seeking relief. *Bobo,* 820 N.W.2d at 516 (citing *Opsahl,* 677 N.W.2d at 423). Thus, to receive an evidentiary hearing on his postconviction claim of ineffective assistance of counsel, Nicks must allege facts that, if proven by a fair preponderance of the evidence, would entitle him to relief under the two-prong test from *Strickland.*

At this point, it is worth noting again that it is the Legislature that has established the threshold showing that petitioners must meet before an evidentiary hearing is warranted. The statute specifically provides that unless the petitioner's allegations and the files and the records of the proceeding *conclusively* show that the petitioner is entitled to no relief, then the postconviction court must schedule a hearing. Minn.Stat. § 590.04, subd. 1. The dis-

**2.** The dissent in effect melds or fuses our different standards of review when it asserts that questions of trial strategy are purely questions of fact. They are mixed questions, and this may be why the dissent cites no case law for its assertion.

sent appears to disagree with the policy choice made by the Legislature and in essence articulates a higher, tougher threshold. But it is not our court's job to second guess the legitimate policy choices made by the Legislature. *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810). The legislative mandate establishing the threshold for when a postconviction court must conduct an evidentiary hearing and our prior case law applying that mandate cannot be overcome simply through emphatic writing, as the dissent attempts to do. Nor is the fact that this case contains a mixed question of law and fact overcome through the dissent's string cite to cases noting our deference to questions of fact.

Nicks alleges that he received ineffective assistance from his trial counsel because counsel failed to correctly read Sprint's response to the subpoena of Johanna Hollis's cellphone records and order a forensic examination of Hollis's phone. Nicks argues that he is entitled to a new trial because the alleged ineffective assistance of his counsel meets the *Strickland* test. Nicks acknowledges that "[t]here is a strong presumption that counsel's performance was reasonable, and matters of trial strategy are given particular deference." But Nicks asserts that his counsel's failure to obtain the cellphone records was not reasonable and was not part of trial strategy. He goes on to specifically assert that his counsel attempted to get the cellphone records, wanted them, but due to inattention and misunderstanding did not get them. In support of his claim for relief, Nicks cites *Wiggins v. Smith* in which the United States Supreme Court found ineffective assistance of counsel when "counsel's conduct ... suggest[ed] that their failure to investigate thoroughly stemmed from inattention, not reasoned strategic judgment." 539 U.S. 510, 526, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

Nicks next asserts that the unreasonable conduct by trial counsel significantly prejudiced him at trial because the threatening phone calls were pivotal to the State's theory of the case and there was a lack of other premeditation evidence against Nicks. Thus, according to Nicks, there is a "reasonable probability" that if the full cellphone records had been in the trial record the trial result would have been different.

The State counters by asserting that Nicks's trial counsel's failure to obtain the phone records was "strategic and reasonable." The State points out that Nicks had provided unreliable leads to his trial counsel on other topics. These false leads included providing alibi witnesses who had been given false stories and testified at trial that Nicks's family members had asked them to lie, thus providing significant opportunity for the State to impeach Nicks at trial. According to the State, trial counsel had no reason to believe Nicks's assertion that Hollis's phone records would be exculpatory and, in fact, trial counsel could reasonably have believed that the records would prove inculpatory. The State also argues that, even if trial counsel behaved unreasonably, the lack of the cellphone records did not prejudice Nicks at trial given the other strong evidence of guilt against him. The other evidence cited by the State includes S.H.'s eyewitness identification of Nicks being at the scene of the shooting, the testimony from two witnesses about overhearing the threatening phone calls, and the ongoing conflict between Nicks and members of the Hollis family.

 To determine whether Nicks is entitled to an evidentiary hearing on his ineffective-assistance-of-counsel claim, we must consider his allegations in the light most favorable to him, and also consider

the "files and records of the proceeding," including the State's arguments. *Riley,* 819 N.W.2d at 167–68. If the postconviction court "concludes there are no material facts in dispute that preclude dismissal, and the State is entitled to dismissal of the petition as a matter of law, the court is not required to hold an evidentiary hearing." *Id.* at 167. But if "material facts are in dispute which have not been resolved in the proceedings resulting in conviction and which must be resolved in order to determine the issues raised on the merits, the court *must* [schedule an evidentiary hearing]." *Id.* at 167–68 (emphasis added).

Facts are material in this instance if they relate to the application of the *Strickland* test because that is the claim that Nicks is bringing in his postconviction petition. Therefore, the postconviction court was obligated to consider Nicks's allegations and the files and records in the light most favorable to Nicks and to determine if facts material to the application of the *Strickland* test are in dispute. Only if Nicks is conclusively entitled to no relief can an evidentiary hearing be denied. After considering Nicks's allegations in the light most favorable to him, as well as the files and records of the proceedings in the case, we conclude that Nicks has shown that he is entitled to an evidentiary hearing on his claim of ineffective assistance of trial counsel. When Nicks's allegations are considered against the two prongs from *Strickland*—performance and prejudice—we conclude that the postconviction court abused its discretion when it concluded that Nicks is *conclusively* entitled to no relief.

### A. Counsel's Performance

■ We give trial counsel wide latitude to determine the best strategy for the client. *Opsahl,* 677 N.W.2d at 421. We have rejected claims that trial counsel was ineffective for: failing to hire a private investigator, *State v. Jones,* 392 N.W.2d 224, 236–37 (Minn.1986); failing to interview prospective witnesses, *Id.;* failing to call prospective witnesses, *Scruggs,* 484 N.W.2d at 26–27; and failing to pursue alternative-perpetrator theories, *Opsahl,* 677 N.W.2d at 421. We have reasoned that the extent of any investigation is a part of trial strategy and, thus, should not be readily second-guessed. *Id.* But the Supreme Court has noted that even if trial counsel "limited the scope of their investigation for strategic reasons ... a cursory investigation [does not] automatically justif[y]" tactical decisions. *Wiggins,* 539 U.S. at 527, 123 S.Ct. 2527. When conducting our analysis, we must apply an objective standard for reasonableness. *Id.*

■ Unlike our earlier cases where counsel elected not to pursue a given line of investigation, *see Opsahl,* 677 N.W.2d at 421, here it is evident from the record that Nicks's trial counsel was interested in obtaining Johanna Hollis's cellphone records, wanted to obtain them, and made several partial attempts to obtain them. Despite the phone records being a pivotal issue from the outset of the police investigation, counsel apparently never obtained or read Sprint's May 2008[3] subpoena response. Counsel stated on the record that the phone records "should have" been given to him "in the beginning," and that the information as to whom Johanna Hollis was speaking during the allegedly threatening 12:11 a.m. phone calls was "very relevant" and again this information "should have" been given to him. After emphatically stating that he needed the information

---

**3.** In its December 28, 2011 Findings of Fact, Conclusions of Law, Order & Memorandum the postconviction court made reference to a May 8, 2009 subpoena response. Based on our review of the record, 2008 appears to be the correct date.

about Johanna Hollis's records or from her cellphone, Nicks's trial counsel either did not read, did not correctly interpret, or failed to understand the cellphone service provider's response to the subpoena.[4] Even without the cellphone records, Nicks's counsel presented a theory at trial that the threatening phone calls did not take place, questioning State witnesses about the alleged phone calls and stating "our whole theory is that the phone call didn't even occur, that they made it all up." Thus, counsel's course of action is distinguishable from the course of conduct in our cases where we have held a trial counsel's actions fell within the purview of trial strategy.

The State and the dissent argue that the failure of Nicks's trial counsel to obtain Johanna Hollis's phone records or otherwise obtain the information that he sought, such as through a forensic examination, amounts to trial strategy and thus is not generally reviewable. But the cases cited by the dissent to support its analysis—for instance, cases where a trial counsel chose not to call certain witnesses—are different. The present case is more analogous to a trial counsel stating that he *wanted* to call a certain witness, issued a *subpoena* to get that witness to trial, implemented a strategy at trial that *relied* on that witness testifying, and then, after that witness failed to appear, inexplicably took no further action. Here, Nicks alleges that his trial counsel stated emphatically that he wanted the evidence in question, presented a defense that in large part turned on having that information available, and then failed to take the necessary steps to obtain

that evidence. Such a course of conduct does not amount to trial strategy.

Moreover, the fact that the alleged failings of Nicks's trial counsel can be portrayed as a choice does not by itself compel us to conclude that counsel's conduct was trial strategy. In general, almost any failing by a trial counsel contains components that could be articulated as a decision or a choice. Instead of treating trial strategy as a factor that we use to assess ineffective-assistance claims, the standard articulated by the dissent turns trial strategy into an impregnable barrier to ineffective-assistance claims. We reject such a formalistic approach.

Obtaining Johanna Hollis's cellphone records was not a course of action that trial counsel considered and rejected; rather, it remained a central part of counsel's theory of the case and his strategy at trial. Unlike the cases where trial counsel has considered possible strategies and rejected them, it appears that the cellphone-record evidence was not obtained because trial counsel did not follow up on information received and did not perform the necessary steps to successfully execute on his main theory of the case. In this respect, the facts here are comparable to those in the Supreme Court's opinion in *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). *Rompilla* is a death penalty case in which trial counsel failed to obtain a defendant's prior conviction file, despite having been informed that the file was available and that the State would use the defendant's prior convictions as a key part of the sentencing phase. *Id.* at 383–

4. The postconviction court appears to have made a factual finding that counsel misread the subpoena response. This finding is supported by the trial transcript and thus is not clearly erroneous; thus, we adopt the court's finding in this decision. But it is worth noting that there is an alternate reading of the transcript that implies that counsel never read the subpoena response at all. If so, the latter possibility is hardly a defense against an ineffective-assistance-of-counsel claim in light of the critical nature of the subpoenaed information.

84, 125 S.Ct. 2456. Trial counsel's strategy in *Rompilla* was closely linked to the evidence he had failed to obtain, and thus trial counsel was limited in presenting the main theory of the case. *Id.* at 388–89, 125 S.Ct. 2456.

■■■ It is true that trial counsel's choices made *after* conducting a thorough investigation of the law and the facts are "virtually unchallengeable." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. But when counsel fails to conduct such a thorough investigation of facts that are so directly related to the defendant's theory of the case, that conduct falls below an objective standard of professional conduct that defendants are entitled to under the United States Constitution. *See Wiggins,* 539 U.S. at 521–22, 123 S.Ct. 2527 (discussing failure of trial counsel to sufficiently investigate); *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[T]he failure to introduce the comparatively voluminous amount of [favorable] evidence ... was not justified by a tactical decision ... [and] clearly demonstrate[s] that trial counsel did not fulfill their obligation to conduct a thorough investigation....") The gravity of this failure is properly considered under the prejudice prong of *Strickland,* discussed below. But in deciding whether Nicks is entitled to an evidentiary hearing on his ineffective-assistance claim, we need not determine whether his counsel actually fell below the objective standard required by *Strickland.* We merely need to decide whether Nicks's

allegations and the files and records fail to *conclusively* show that counsel fell below this standard. Nicks has alleged that counsel sought this information, that he failed to obtain or misread it, and this allegation is not contradicted by the files or records of the proceeding.[5] Whether Nicks's allegations in the postconviction petition are true will be subject to further development at the evidentiary hearing. Therefore, we conclude that Nicks has made sufficient allegations that counsel's assistance fell below an objective standard of reasonableness to warrant an evidentiary hearing on the matter.

## B. Prejudice

In an ineffective-assistance claim, we next consider whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Scruggs,* 484 N.W.2d at 25. Again, an evidentiary hearing is warranted unless Nicks's allegations, when being viewed in the light most favorable to him, conclusively show that he is not entitled to relief.

Evidence regarding Nicks's alleged threatening phone calls to Johanna Hollis played a highly significant role at trial. The two threatening phone calls were featured in both the State's opening and closing statements, including at least six specific references to the threatening calls during the closing argument. The State argues that the new evidence does not prove that threatening phone calls from

5. The dissent correctly notes that Nicks's allegations are not contradicted by the files or the records. But the dissent then proceeds to incorrectly argue that Nicks's allegations are "based entirely on the record." The two are not the same and the dissent's conflation of the two amounts to a logical fallacy. Stating that a man "traveled out of state last week" is not *contradicted* by further stating that "last Tuesday the man and his girlfriend took the

10:00 a.m. Delta flight from Minneapolis/St. Paul International Airport to O'Hare International Airport in Chicago, where the two of them spent the night together in the same room at a local hotel." Likewise, Nicks's allegations are not contradicted by the files or the records, but Nicks's allegations go into more detail and implicate more facts than have so far been developed in the record.

Nicks *did not* occur, only that the alleged threats did not happen during the 12:11 a.m. calls from Nicks to Johanna Hollis's cellphone. Nicks counters that the State was "unwavering and explicit" at trial that its theory of the case was that Nicks had threatened Johanna Hollis during one of two calls placed from Nicks's cellphone to Johanna Hollis's cellphone at 12:11 a.m. The record supports Nicks's assertions that the State's major theory at trial was that the threatening conversations happened during the two disputed 12:11 a.m. phone calls. Nicks has documented at least 14 examples of the State presenting that theory.

Given the significant number of calls between the several persons connected to the shooting and the number of different phone lines involved, it is certainly possible that, as the State now theorizes, the threatening conversation between Nicks and Johanna Hollis occurred during a different phone call. But there is no evidence in the record showing which phone call that might be. In denying Nicks's postconviction appeal, the postconviction court theorized that Nicks could have spoken to Johanna Hollis during a 12:01 a.m. phone call from M.G. to Hollis, and that "[i]t is undisputed that [M.G.] was with [Nicks] that evening, and at the time of that call." But such a theory is disputed by Nicks and would contradict the State's evidence of Nicks's exact whereabouts at that time as determined from the State's cellphone-tower evidence.

The State again asserts that even without a threatening phone call there was significant evidence linking Nicks to the shooting, including the eyewitness testimony from S.H., the cellphone-tower-location information that placed Nicks near the scene at the time of the shooting, and the simmering feud between Nicks and several members of the Hollis family. Neverthe-

less, it is possible to link Nicks to the shooting—even tie him to it—and still conclude that a reasonable probability exists that, but for counsel's errors, the result of the trial might have been different. More specifically, it is very possible that the trial result could have been different if Johanna Hollis's cellphone records had been presented at trial. Nicks was charged with both first- and second-degree murder, and the alleged threatening phone calls appear to be the most persuasive evidence in the record directly showing the requisite premeditation for first-degree murder. *Compare* Minn.Stat. § 609.185(a)(1) (2012), *with id.* § 609.19 (2012). Thus, under the standard of review for granting an evidentiary hearing, the State's assertion is insufficient to thwart Nicks's allegations as to the prejudice prong of *Strickland.*

Perhaps most significantly in determining prejudice, this case features a rare indication of what evidence was potentially considered by the jury. More specifically, there is evidence that during the jury's deliberations phone records were closely considered—specifically Johanna Hollis's records. During its deliberations, the jury asked for the telephone numbers related to certain phone-record exhibits, then a list of all exhibits, and specifically used the sample of Johanna Hollis's cellphone records. When viewed in the light most favorable to Nicks, these inquiries from the jury represent powerful evidence that his counsel's failure to obtain the allegedly exculpatory phone records prejudiced Nicks at trial.

In determining whether Nicks has alleged sufficient facts to warrant a hearing, "[u]nless the petition and the files and records of the proceedings conclusively show" that Nicks is entitled to no relief, it is worth considering two additional lines of argument contained in the postconviction record. First, Sergeant Fors responded to and critiqued the report authored by

Nicks's expert about the forensic examination of Johanna Hollis's cellphone. Second, the issue of call waiting and speculation by Fors and the postconviction court about the possibility that call waiting obfuscated the results of the forensic examination does not change our position with respect to the need for an evidentiary hearing.

In response to the forensic examination report issued by Nicks's expert, Fors provided a written response in which he speculates that the forensic examination of Hollis's cellphone was not complete because: the expert misread the manual for Johanna Hollis's cellphone; some calls might have been deleted from the call log; and the report failed to discuss the call-waiting feature. None of these observations refute Nicks's allegations that the phone calls did not occur, when those allegations are viewed in the light most favorable to Nicks.

The postconviction court also addressed the call waiting issue. Both Fors and the court suggested that, if Nicks had called Hollis while she was on another call and Hollis had ended her call to answer Nicks's call, then it is possible that Nicks's 12:11 a.m. calls would not show up in the call history on her cellphone. But phone calls leave evidence—in the memory of the cellphone and in the records maintained by cellphone companies. This is a thoroughly investigated case with extensive records available. The call-waiting feature is used when someone is speaking on his or her phone and another call is received while the phone is still in use. The user can then choose to take the new call through the call-waiting feature. Thus, whether Hollis received a call from Nicks via call waiting could be determined by looking at when she received or placed a call and when Nicks's alleged call-waiting call was placed. If Nicks's call overlapped with

when Johanna Hollis was speaking on her cellphone, then she might have used call waiting to receive Nicks's call.

This claim presents a relatively straightforward equation that involves looking at what calls Hollis was on, how long those calls were, and then determining if she was still on the phone at 12:11 a.m. when Nicks allegedly called her. The court speculated that the call-waiting feature could have been a factor because of a 39–second call that Hollis had at 12:09 a.m., but Nicks asserts that a 39–second call commenced anytime during 12:09 a.m. could not have overlapped with a phone call commencing at 12:11 a.m. or later. Simple addition shows that Nicks's assertion has merit and that the court may be reaching too far with its speculation. Regardless of the specifics, two points are important: these are *exactly* the type of factual disputes that an evidentiary hearing is designed to resolve, and Nicks does not carry the burden of rebutting each and every possible theory presented. At this step of the proceeding, Nicks simply must make allegations that, if proven by a preponderance of the evidence, would entitle him to relief. We conclude that he has done precisely that. Finally, the foregoing analysis demonstrates that the dissent's assertion that "[t]here is simply nothing factually that needs to be developed" is unfounded.

Because we conclude that Nicks's allegation that the failure of his trial counsel to obtain Johanna Hollis's cellphone records may have prejudiced him at trial, and we have already concluded that Nicks has alleged sufficient facts to support his claim that his counsel's performance fell below an objectively reasonable standard, we conclude that Nicks has alleged sufficient facts to entitle him to an evidentiary hearing on his claim of ineffective assistance of counsel. Therefore, the postconviction court abused its discretion when it denied

Nicks's request for relief without a hearing.[6]

## II.

■ Nicks raises four additional issues in his primary brief: (1) the forensic examination of Johanna Hollis's cellphone proves that no threatening phone calls occurred between Nicks and Hollis, meaning that the witnesses who testified that they overheard the alleged threatening phone calls at trial gave false testimony and thus Nicks was convicted using false testimony; (2) the trial court erred by admitting evidence that Nicks ran a prostitution business and was a pimp; (3) the State engaged in alleged prosecutorial misconduct; and (4) "numerous, serious errors" in the case mean that Nicks should receive a new trial. Nicks also filed a supplemental pro se brief, which raises overlapping and additional claims.

■ When a defendant alleges during postconviction proceedings that false testimony was given at trial, we apply the *"Larrison* rule" to determine whether a new trial is warranted. *State v. Caldwell* 322 N.W.2d 574, 584–85 (Minn.1982). The *Larrison* rule provides that a new trial may be granted on the grounds of false or perjured testimony where:

(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That without [the testimony] the jury *might* have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Id.* at 585 (quoting *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928)). Even when all of Nicks's allegations are taken as true, Nicks's false-testimony claim fails under both prong (a) and (c). When taken as true, Nicks's allegations relate only to demonstrating that the State's theory at trial—that Nicks threatened Johanna Hollis during one of the two disputed 12:11 a.m. phone calls—could not be true because Nicks did not speak to Hollis during those calls. This allegation does not make our court "reasonably well satisfied" that the witnesses gave false testimony. And even if we were "reasonably well satisfied" that the witnesses gave false testimony, Nicks's allegation fails under prong (c) because Nicks was well aware of how the witnesses would testify at trial and contested their accounts. Thus, Nicks was not "taken by surprise" when the false testimony was given and he was able to "meet" the testimony. For the foregoing reasons we conclude that Nicks is entitled to no relief on his claim of false testimony.

Nicks's remaining claims are also meritless. His allegation that it was error for the court to admit evidence about Nicks's alleged prostitution business does not rise to the level required for Nicks to receive relief on that allegation. Nicks also alleges prosecutorial misconduct because he claims that the prosecutor: misstated the law on aiding and abetting, elicited inadmissible testimony, and improperly denigrated the defense by arguing that Nicks was tailoring his testimony to reflect the cellphone-tower evidence. We conclude that none of these alleged errors are sufficient to warrant an evidentiary hearing or a new trial.

---

**6.** The dissent claims that today we create a "new rule" but the dissent does not state what this "new rule" is, and we are at a loss as to what it might be. Our decision today is grounded in a legislative mandate and our prior case law, and flows directly from both.

Nicks also filed a supplemental pro se brief in which he alleges ineffective assistance of trial counsel, prosecutorial misconduct, that the trial court erred by admitting prejudicial evidence, that a statement by an officer at the scene of the shooting supports Nicks's ineffective-assistance-of-counsel claim, and that the State did not establish its burden of proof beyond a reasonable doubt. Some of these claims overlap with the claims raised in Nicks's principal initial brief and were discussed above. After considering the additional claims raised in Nicks's supplemental pro se brief, we conclude that they lack merit.

Reversed and remanded.

GILDEA, Chief Justice (dissenting).

I respectfully dissent. The majority remands this case to the postconviction court for an evidentiary hearing on Appellant Nidjia Nicks's ineffective assistance of trial counsel claim. In doing so, the majority fails to apply well-established law regarding postconviction evidentiary hearings and claims of ineffective assistance of trial counsel. Applying our well-established law to the facts of this case, I conclude that (1) there is no need to grant a postconviction evidentiary hearing because Nicks's claim is based entirely on the trial record, and (2) when the postconviction court's factual findings are afforded the required deference, the matters about which Nicks complains plainly involve trial strategy that is beyond the scope of our review. Based on these conclusions, I would affirm the postconviction court's summary denial of Nicks's ineffective assistance of trial counsel claim.

I.

Our precedent recognizes that the purpose of a postconviction evidentiary hearing is *to develop the record* when a claim depends on a fact outside the trial record. *See, e.g., State v. Hokanson,* 821 N.W.2d 340, 357–58 (Minn.2012); *Leake v. State,* 737 N.W.2d 531, 541 (Minn.2007) (remanding for an evidentiary hearing regarding discussions between counsel and defendant as to consequences of a plea); *Dukes v. State,* 621 N.W.2d 246, 254–55 (Minn.2001) (remanding for an evidentiary hearing regarding discussions between defendant and counsel as to counsel's concession of defendant's guilt). A postconviction evidentiary hearing therefore is not required when an ineffective-assistance-of-counsel claim is based entirely on the trial record. *See Buckingham v. State,* 799 N.W.2d 229, 233 (Minn.2011). On the other hand, "[a]n evidentiary hearing on a petition is mandated whenever material facts are in dispute[,] which have not been resolved in the proceedings resulting in conviction and which must be resolved in order to determine the issue raised on the merits." *Riley v. State,* 819 N.W.2d 162, 167 (Minn. 2012) (citation omitted) (internal quotation marks omitted).

Without identifying any disputed material fact that is outside the trial record, the majority concludes that an evidentiary hearing is warranted on Nicks's claims that his trial counsel was ineffective for failing to secure records of the victim's cellphone. In its analysis of the first prong of the *Strickland* test, the majority states that "Nicks has alleged that counsel sought [the telephone] information, that he failed to obtain or misread [the subpoena response], and this allegation is not contradicted by the files or records." [7] *Supra* at

---

7. The two prongs of the *Strickland* test are: (1) "counsel's representation fell below an objective standard of reasonableness," and (2)

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

27. Because the majority's own analysis establishes that the issue about which Nicks complains is contained in the trial record, our precedent does not support a remand for an evidentiary hearing. There is simply nothing factually that needs to be developed or that is contested to necessitate a remand for an evidentiary hearing regarding counsel's alleged failure to secure the victim's cellphone records.[8] Our district courts and public defenders are already overburdened; we ought not to add to that burden by ordering hearings for the sake of hearings when there is no disputed factual question that actually needs to be litigated.[9]

The majority misinterprets Minn.Stat. § 590.04 (2012), when it suggests that, even in the absence of a disputed material fact that is outside the trial record, an evidentiary hearing is required whenever the *trial record* fails to conclusively show that the defendant is entitled to no relief. When properly interpreted, section 590.04 provides a petitioner an opportunity to develop the record through the presentation of evidence that proves "the *facts* alleged in the petition" by a fair preponderance. of the evidence. Minn.Stat. § 590.04, subd. 3 (emphasis added). But if the "*the petition* and *the files and records* of the proceedings conclusively show that the petitioner is entitled to no relief," there is no need for an evidentiary hearing because even if the petitioner proved the facts alleged in the petition, he would not be entitled to relief.[10] *Id.*, subd. 1 (emphasis added). This statutory scheme assumes that the petition alleges facts out-

---

*State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003) (citation omitted) (internal quotation marks omitted).

8. The majority contends that it is "a logical fallacy" to equate its concession that Nicks's factual allegations regarding counsel's failure to obtain the cellphone records are not contradicted by the files or records with a concession that there are no material disputed facts regarding counsel's failure to obtain the cellphone records. In support of its contention, the majority asserts that "Nicks's allegations go into more detail and implicate more facts than have so far been developed." *Supra* at 28 n. 5. Yet the majority fails to specify any disputed factual allegation made by Nicks that is not based on the trial record. Instead, the majority writes about a trip to Chicago. It is not necessary to depart from Minnesota or our precedent to resolve this case. A careful review of Nicks's petition for postconviction relief indicates that each factual allegation regarding counsel's failure to obtain the cellphone records is followed by a citation to the trial record. I fully agree that had Nicks alleged a *material, disputed* fact that *occurred outside the trial record*, the fact that the trial record does not contradict the alleged fact would not eliminate a need for an evidentiary hearing to resolve the material fact dispute. But that is not the case here.

9. The majority argues that there is a factual dispute regarding the issue of "whether Hollis received a call from Nicks via call waiting." *Supra* at 31. The majority then goes on to admit that this purported dispute can be resolved by applying "[s]imple addition" to the call logs in the record. *Id.* at 32. Surely the majority is not seriously contending that the postconviction court and the parties need to expend resources to hold an evidentiary hearing for the sole purpose of conducting this "simple" mathematical calculation to undisputed numbers. Any such contention is inconsistent with our precedent. *Cf.. State v. Ferguson*, 742 N.W.2d 651, 660 (Minn.2007) (noting that "to justify the expense and risk of transporting the petitioner to an evidentiary hearing, it seems to us that the petitioner has an obligation to make a greater showing of a genuine recantation than was made here").

10. The majority argues that I "disagree with the policy choice made by the Legislature" because I "articulate[ ] a higher, tougher threshold" for holding an evidentiary hearing. *Supra* at 21. I do no such thing. The threshold I apply is the one our court has consistently applied until the majority's decision today. *See, e.g., Hokanson*, 821 N.W.2d at 357; *Buckingham*, 799 N.W.2d at 233; *Leake*, 737 N.W.2d at 541; *Dukes*, 621 N.W.2d at 254.

side the trial record, and therefore there is a need to develop the record. It is axiomatic that when a petition fails to allege a contested material fact that is outside the trial record, there is no need for an evidentiary hearing.[11] Because the majority's decision to remand this case to the postconviction court for an evidentiary hearing is contrary to well-established law, I dissent.

## II.

Not only does the majority depart from precedent in ordering an evidentiary hearing in this case, the majority also departs from precedent in concluding that matters of trial strategy are subject to review for ineffective assistance of counsel. In my view, the trial record conclusively shows that Nicks is entitled to no relief on his ineffective-assistance-of-counsel claim because, when the postconviction court's findings are afforded the deference required, the matters about which Nicks complains plainly involve trial strategy and trial strategy is not reviewable in the context of an ineffective assistance of trial counsel claim.

As the majority notes, we review de novo the postconviction court's "decisions" on "claims of ineffective assistance of counsel." *Opsahl v. State*, 677 N.W.2d 414, 420 (Minn.2004). But we review factual findings underlying those decisions for clear error. *Hawes v. State*, 826 N.W.2d 775, 783–85 (Minn.2013) (concluding that the record supported the factual finding on premeditation that the postconviction court made in the course of analyzing the second prong of *Strickland* test); *see also Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (explaining that state court findings of fact made in the course of deciding a claim of ineffective assistance of counsel are subject to the clearly erroneous standard of review).[12]

**11.** The majority's analysis loses sight of this axiom when it refers to Nicks's "allegations" rather than the "facts alleged in the petition." The imprecise term "allegations" causes the majority to blur the distinction between a defendant's legal claim and the underlying facts that allegedly support the legal claim. In considering whether to grant an evidentiary hearing to resolve underlying factual disputes, a postconviction court must view the *alleged facts*, not the *alleged legal claim*, in a light most favorable to the petitioner. *See, e.g., Riley*, 819 N.W.2d at 169 (viewing the facts alleged in the petition in the light most favorable to the petitioner).

**12.** The majority apparently contends that affording deference to the factual findings made by a postconviction court in the course of deciding a claim of ineffective assistance of counsel represents a departure from our precedent. But it is in fact the majority's decision that reflects a departure from controlling precedent. In failing to apply the clearly erroneous review standard set forth in *Strickland*, 466 U.S. at 698, 104 S.Ct. 2052, to the postconviction court's factual findings, not only does the majority depart from our

precedent, but it also places Minnesota out of step with courts across the country. *See, e.g., Bennett v. United States*, 663 F.3d 71, 85 (2d Cir.2011) (explaining that its deference to the findings made by district court in the course of deciding an ineffectiveness claim reflected "the superiority of the trial judge's position to make determinations of credibility since only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said" (citation omitted) (internal quotation marked omitted)); *Ahmad v. Redman*, 782 F.2d 409, 412 (3d Cir.1986) (explaining that the statutory presumption of correctness attaches to the subsidiary findings of historical fact that are relevant to the resolution of mixed questions of fact and law raised by a claim of ineffective assistance of counsel); *United States v. Auerbach*, 745 F.2d 1157, 1161 (8th Cir.1984) (explaining that, "[w]e will affirm a district court's finding that a habeas petitioner was denied effective assistance of counsel where the district court's findings of fact which support the conclusion of law are not clearly erroneous"); *Gaines v. Comm'r of Corr.*, 306 Conn. 664, 51 A.3d 948, 959–60, 966 (2012) (explaining that

We therefore are required to "afford great deference to a [postconviction] court's findings of fact and will not reverse the findings unless they are clearly erroneous." *Carlton v. State,* 816 N.W.2d 590, 599 (Minn.2012) (citation omitted) (internal quotation marks omitted). Only when there is no reasonable evidence to support the finding or when we are left with the definite and firm conviction that a mistake occurred is a finding clearly erroneous. *State v. Evans,* 756 N.W.2d 854, 870 (Minn.2008).

Whether defense counsel made a strategic decision is a question of historical fact that is separate and distinct from the question of whether the strategic decision was a reasonable exercise of professional judgment under *Strickland.* *Wood v. Allen,* 558 U.S. 290, 301–04, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010); *see also Rivera v. State,* 58 A.3d 171, 181 (R.I.2013) (explaining that appellate courts must defer to "findings of historical fact regarding trial counsels' decision not to mount a third-party perpetrator defense"). In *Wood,* the United States Supreme Court concluded that "the state court's finding that Wood's counsel *made a strategic decision* not to pursue or present evidence of Wood's mental deficiencies was not an unreasonable

determination *of the facts* in light of the evidence presented in the state-court proceedings." *Wood,* 558 U.S. at 301, 130 S.Ct. 841 (emphasis added).

Based on its observations during the jury trial, the postconviction court found that: (1) defense "counsel made a clear decision to rely on cross examination to dispute [the threatening phone call] testimony," and (2) counsel was not "totally derelict in his duty in attempting to locate exculpatory evidence." Instead of considering whether there is reasonable evidence to support these findings, the majority independently reviews the trial record, concluding that "[o]btaining ... Hollis's cellphone records was not a course of action that trial counsel considered and rejected; rather, it remained a central part of counsel's theory of the case and his strategy at trial." [13] *Supra* at 26. The majority's analysis amounts to a de facto reversal of the postconviction court's findings. But our standard of review does not permit us to so easily second-guess the postconviction court's factual findings. Indeed, in my view, the majority's analysis undermines the very purpose of the clearly erroneous standard of review, which is to ensure "uniformity and consistency in the

the postconviction court's finding that "the alibi testimony was credible and compelling" was subject to the clearly erroneous standard of review because a postconviction court "is the sole arbiter of the credibility of witnesses and weight to be given to their testimony" (citation omitted) (internal quotation marks omitted)); *Windom v. State,* 886 So.2d 915, 921–26 (Fla.2004) (deferring to the postconviction court's determinations regarding the credibility of witnesses and the weight of the State's evidence when independently reviewing the postconviction court's conclusion that there was no reasonable probability that the outcome of the trial would have been different); *Riley v. State,* 110 Nev. 638, 878 P.2d 272, 279 (1994) (deferring to the trial court's underlying credibility assessment when independently reviewing the trial court's conclu-

sion that counsel's failure to investigate statements reported by the defendant's mother did not fall below an objective standard of reasonableness).

13. The majority contends that the issue of whether defense counsel made a conscious decision to dispute the threatening phone call testimony with a cross-examination strategy, rather than a phone-record strategy, presents a question of law, not a finding of historical fact. *Supra* at 18 n. 1. That contention is inconsistent with the United States Supreme Court's decision in *Wood* and our general understanding of historical facts, *see McGlothlin v. Steinmetz,* 751 N.W.2d 75, 80 (Minn.2008) (describing historical facts as how many nights McGlothlin stayed at the Steinmetz home or for how long).

law by prohibiting the retrial of a case on appeal." *In re Welfare of M.D.O.*, 462 N.W.2d 370, 374 (Minn.1990).

My review of the record confirms that the postconviction court's findings are not clearly erroneous. Defense counsel sought a court order requiring the State to obtain and disclose the records for the victim's cell phone. The records were not provided, but it was not because counsel was derelict in failing to request them. Faced with the reality that the records had not been provided when the trial was well underway, defense counsel had a decision to make: should he seek a continuance to pursue further the records or should he persist with his initial strategy of challenging the State's theory that Nicks had threatened the victim through other means, including witness cross-examination. Because the record contains reasonable evidence to support the postconviction court's findings that counsel was not "derelict in his duty in attempting to locate exculpatory evidence" and instead "made a clear decision" to persist with his initial strategy, we are bound by those findings on appeal.

When the postconviction court's factual findings are applied to our well-established case law, the matters about which Nicks complains plainly involve trial strategy that is beyond the scope of our review. In one of our leading cases on the question of trial strategy, *State v. Jones*, 392 N.W.2d 224 (Minn.1986), we made clear that contentions that "relate to trial strategy," and not to "errors in professional performance," do not fall within the scope of appellate court review for effective assistance. *Id.* at 236. Jones alleged that his counsel was ineffective because he failed to hire an investigator and failed to interview witnesses. *Id.* We said that decisions about "[w]hich witnesses to call at trial and what information to present to the jury are

questions that lie with the proper discretion of the trial counsel." *Id.* And we held that such "trial tactics should not be reviewed by an appellate court, which, unlike the counsel, has the benefit of hindsight." *Id.* We have repeatedly followed that rule. *See, e.g., Andersen v. State*, 830 N.W.2d 1, 13 (Minn.2013) (noting that conduct that "falls within trial strategy ... is not reviewable" for ineffective assistance); *State v. Davis*, 820 N.W.2d 525, 539 n. 10 (Minn. 2012) (noting that "decisions about which witnesses to interview are typically matters of trial strategy that we will not review"); *Francis v. State*, 781 N.W.2d 892, 898 (Minn.2010) (noting that whether to cross-examine the State's expert witness constitutes trial strategy); *Williams v. State*, 764 N.W.2d 21, 31 (Minn.2009) ("When determining whether alleged failure to investigate constitutes ineffective assistance of counsel, we consider whether the decision was based on trial strategy or whether it demonstrated that counsel's performance fell below an objective standard of reasonableness."); *Opsahl*, 677 N.W.2d at 421 ("We are in no position to second-guess counsel's decision to focus his strategy on other defenses instead of investigating [other] suspects."); *State v. Doppler*, 590 N.W.2d 627, 633 (Minn.1999) ("What evidence to present to the jury, including which witnesses to call, represents an attorney's decision regarding trial tactics and lies within the proper discretion of trial counsel."); *Hodgson v. State*, 540 N.W.2d 515, 518 (Minn.1995) (noting that defense counsel's decision not to present evidence that someone else might have committed the murder and not to investigate leads was trial strategy).

Without affording any deference to the postconviction court's findings that counsel was not "derelict in his duty in attempting to locate exculpatory evidence" and instead "made a clear decision" to persist with his initial strategy of challenging the testimo-

ny through cross-examination and other means, the majority finds that "[o]btaining ... Hollis's cellphone records was not a course of action that trial counsel considered and rejected; rather, it remained a central part of counsel's theory of the case and his strategy at trial." *Supra* at 26. Having substituted its factual finding for the finding of the postconviction court, the majority contends the general rule prohibiting review of trial strategy should not apply when a defense attorney "inexplicably [takes] no further action" to obtain relevant evidence. *Supra* at 26. But the majority's finding that defense counsel "inexplicably took no further action" is directly contrary to the postconviction court's finding that counsel made a strategic decision. Under our precedent, that type of decision is not reviewable. *See Opsahl,* 677 N.W.2d at 421.

The majority argues that my adherence to our precedent "turns trial strategy into an impregnable barrier to ineffective-assistance claims." *Supra* at 26. That "barrier" is exactly what our precedent requires, and with good reason. *See Opsahl,* 677 N.W.2d at 421 ("Our reluctance to scrutinize trial tactics is grounded in the public policy of allowing counsel to have the flexibility to represent a client to the fullest extent possible." (citation omitted) (internal quotation marks omitted)). If the majority contends that these policy reasons no longer provide support for our rule, it should explain why and how that is so. *See Hokanson,* 821 N.W.2d at 350 (noting

that "we are extremely reluctant to overrule our precedent under the principle of *stare decisis* and require a compelling reason before a prior decision will be overruled" (citation omitted) (internal quotation marks omitted)).

Rather than adhering to our precedent, the majority writes a new rule that permits examination into the wisdom of trial counsel's strategic decisions. In writing this new rule today, the majority relies on death penalty cases from the United States Supreme Court. That an appellate court's review of counsel's performance may be broader in the context of the death penalty is not unexpected. That broader review in the "unique" context of the death penalty, however, does not support the conclusion that we should depart from our precedent in this case. *Cf. United States v. Harper,* 729 F.2d 1216, 1222–23 (9th Cir.1984) ("As the Supreme Court has recognized, the death penalty is unique."); *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion) (noting that the death penalty is "different in kind from any other punishment imposed under our system of criminal justice"). Additionally, the majority misapplies the review standard from these cases when it focuses on "counsel's failure to obtain the cellphone records," *supra* at 21, 24–25, rather than the issue of whether the reasons supporting counsel's decision not to seek a midtrial continuance were objectively reasonable.[14] In light of the

---

**14.** On the seventh day of jury selection, May 26, 2009, defense counsel explained on the record why he would not seek a midtrial continuance if the State failed to secure and disclose Hollis's cellphone records. More specifically, counsel said,

> "I'm not going to ask for a continuance. Maybe—I'm going to make a good record of [the State's failure to disclose Hollis' cellphone records]. We are in trial. But I'm going to make a good record and you might

end up trying it again anyway if you [sic] lose but I'm not planning on losing. So it will be moot then."

Counsel's comments reflect a "clear decision" not to seek a continuance based on his belief that he could win the case without Hollis's cellphone records, and that in the event he lost the trial, the State's failure to disclose the phone records would constitute reversible error. Thus, even under the review standard from the death penalty cases, Nicks is conclu-

postconviction court's finding that counsel was not "derelict in his duty in attempting to locate exculpatory evidence" and instead "made a clear decision" to persist with his initial strategy, I would resolve this case consistent with our precedent and hold that matters of trial strategy, such as the matters about which Nicks complains, are not within the scope of review in the context of a claim for ineffective assistance of counsel.

In sum, I dissent from the majority's decision to remand this case to the postconviction court for an evidentiary hearing on Nicks's ineffective-assistance-of-counsel claim for two reasons. First, there is no need for an evidentiary hearing because the majority has failed to identify any disputed material fact that is outside the trial record. Second, the trial record conclusively shows that Nicks is entitled to no relief because when the postconviction court's findings are afforded the required deference, the matters about which Nicks complains plainly involve trial strategy and trial strategy is beyond the scope of our review in the context of an ineffective assistance of trial counsel claim. For the reasons articulated above, I would affirm.

DIETZEN, J. (dissenting).

I join in the dissent of Chief Justice Lorie Gildea.

sively entitled to no relief on his claim of ineffective assistance of counsel because the reasons for his decision not to seek a midtrial continuance, articulated by defense counsel as part of the trial record, are not objectively unreasonable.