*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1932**

State of Minnesota,
Respondent,

vs.

Jack Arnold Haines,
Appellant.

**Filed August 3, 2015
Affirmed
Harten, Judge\***

Steele County District Court
File No. 74-CR-13-723

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Daniel A. Mcintosh, Steele County Attorney, Owatonna, Minnesota (for respondent)

Zachary C. Bauer, Andrew L. Davick, Meshbesher & Spence, Ltd., Rochester, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Rodenberg, Judge; and Harten, Judge.

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HARTEN**, Judge

Appellant challenges his conviction on the ground that he was deprived of the effective assistance of counsel because his counsel did not retain an expert to analyze a recording made during the incident giving rise to the conviction; he also challenges his sentence, arguing that the district court abused its discretion in denying his motion for a downward dispositional departure. Because appellant's counsel provided effective assistance and because we see no abuse of discretion, we affirm.

## FACTS

Appellant Jack Haines received a notice that the routine check of the smoke detectors in his rented townhouse would occur between 8:30 and 10:00 a.m. on 10 April 2013. Before 8:30, appellant removed the smoke detectors from the ceilings, put them on a kitchen chair, moved his rifle from the second-floor bedroom down to the first-floor living room, made a blank bullet, and loaded it into the rifle. He then set up and turned on a digital audio recorder, unlocked the front door, sat in his recliner within reach of the rifle, and waited.

The property supervisor (P.S.) for the company that owned the townhouse complex and the property manager (P.M.) for the complex arrived at 8:38 and knocked on appellant's door several times. When P.S. called out, "Management," appellant did not respond. P.S. and P.M. entered the townhouse and told appellant they were there to test the smoke detectors, as required by both the property owner and the local fire department.

They noticed the smoke detectors lying on a chair. When P.S. picked one up, he saw that its back cover was missing. P.S. told appellant that, because the smoke detector could not be replaced without the back cover, they would need to get him a new smoke detector; he also said that the smoke detectors had to be tested in their locations on the ceilings. P.S. then looked at appellant, who was about five feet away from him, and saw that appellant was holding the rifle pointed toward the ceiling and that appellant's hand was near the trigger. P.S. was scared but told appellant he was not afraid and had been in military service.

Appellant told P.S. and P.M. to check the smoke detectors or leave. According to them, appellant then lowered the rifle and pointed it at P.S. Because both P.S. and P.M. were afraid appellant would shoot them, P.S. quickly pressed the button on each smoke detector, and the two of them left. P.S. then called 911 and reported the incident.

After they left, appellant replaced the smoke detectors, took the rifle back to his bedroom, and replaced the blank bullet with a live round. When the police arrived, appellant told them what he had done but said he had pointed the rifle only at the ceiling, not at P.S. or P.M. Appellant gave the audio recording to the police, who also took his rifle.

Appellant was arrested and taken to jail. After he was read the Miranda warning, he was interviewed by an officer. He told the officer that (1) earlier on the morning of 10 April, he had brought his rifle down from his bedroom and replaced the live bullet with a blank; (2) he brought the rifle downstairs to intimidate the people who were coming to test the smoke detectors; (3) except for telling P.S. and P.M. three times to

3

inspect the smoke detectors or leave, he had said nothing to them; (4) he raised the rifle when P.S. turned toward the stairs; and (5) he intended to fire into the couch if P.S. proceeded towards the stairs and did not comply with what appellant wanted him to do. Appellant was charged with second-degree assault and terroristic threats.

At trial, the jury heard testimony from P.S., P.M., three police officers, and appellant, as well as the audio recording. Appellant was found guilty on both counts. The district court denied appellant's motion for a downward dispositional departure and sentenced appellant to the presumptive 36 months in prison.

On appeal, appellant argues that his trial counsel's failure to retain an expert to provide an analysis of the recording deprived him of the effective assistance of counsel and that the denial of his motion for a downward dispositional departure was an abuse of the district court's discretion.

## DECISION

### 1. Ineffective Assistance of Counsel

Because ineffective-assistance-of-counsel claims involve mixed questions of law and fact, we review them de novo. *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn. 2003). A claimant must prove both that counsel's performance was deficient and that the claimant was prejudiced as a result, i.e., that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686-87, 104 S. Ct. 2052, 2064 (1984). "[Because] it is all too easy for a court . . . to conclude that a particular act or omission of counsel was unreasonable, *Strickland* admonishes reviewing courts to

4

judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Rhodes*, 657 N.W.2d at 844 (quotation omitted).

As a threshold matter, review of counsel's challenged conduct at or near the time it occurred is best accomplished by a postconviction court, not an appellate court. *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 ("[I]nquiry into [trial] counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions . . . ."); *State v. Gustafson*, 610 N.W.2d 314, 321 (Minn. 2000) ("Generally, an ineffective assistance of counsel claim should be raised in a postconviction petition for relief, rather than on direct appeal."). Here, because no postconviction proceeding was held, there is no decision on the ineffective-assistance claim for this court to review, nor is there any record of what appellant's trial counsel did at trial or said to appellant. Counsel's performance is presumed to be reasonable, *Andersen v. State*, 830 N.W.2d 1, 10 (Minn. 2013), and the burden of providing the appellate court with a record to establish any alleged errors in counsel's performance is the claimant's. *State v. Carlson*, 281 Minn. 564, 566, 161 N.W.2d 38, 40 (1968); *see also Gail v. State*, 732 N.W.2d 243, 248-49 (claimant had not "provided any factual support for his assertions . . . that his trial counsel failed to investigate" and that "[b]ecause [he] has not provided any facts to support his assertions that his counsel failed to investigate his case, he is not entitled to postconviction relief").

Appellant argues that his counsel provided ineffective assistance by failing to retain an expert to enhance the quality of the recording, which was impeded by dogs

5

barking and smoke detectors beeping. But appellant provides no evidence as to what an expert could have achieved by way of improving the recording, and, more significantly, no evidence of what an enhanced recording would have contributed to appellant's defense.

Appellant argues that "[t]he theory of the defense was that [he] did not threaten [P.S.] or [P.M.] and that they were not in fear." But there was no evidence, other than appellant's own testimony, to support this defense. Both P.S. and P.M. testified that their fear intensified when appellant lowered the gun he had pointed at the ceiling. P.S. said:

> [Appellant] started laughing. And then that's when he lowered the gun and said, "This is your last chance. Check the smoke alarms or get the fuck out of my house." And at that time, when I looked at him when he said that, I could tell in his eyes he wasn't kidding. So I turned around and walked away. . . . [P.M.] was basically behind me but off to the left a little bit, and she was white as a sheet. . . . I didn't want to get shot in the back.

P.S. was then asked about the gun.

> Q.　And when you say he lowered the gun, how did he lower it?
> A.　Just went down like this (indicating) and pointed it at us.
> . . . .
> Q.　Straight out in front of him?
> A.　Yep.
> Q.　Where was it pointed?
> A.　Right at me.
> . . . .
> Q.　And when the rifle was pointed at you, how were you feeling then?
> A.　Scared.

On redirect examination, P.S. was questioned again.

> Q. Did you have concerns . . . about whether he would use that gun or not?
> A. Yes.
> Q. What were your concerns?
> A. That he was going to shoot us.

P.M. also was asked how she felt when she saw the gun lowered; she answered, "I believe stunned . . . ." Asked if she had "concerns about whether or not [appellant] would actually use that gun," she answered, "Yes." She answered "Yes" again on redirect examination, when she was asked, "Did you have concerns of [appellant] potentially using that gun?" The audio recording would not show whether appellant did lower his gun and point it at P.S. and P.M., which is the only significant conflict between their account of the incident and appellant's account. Moreover, both P.S. and P.M. testified that appellant did not talk about the gun or say anything to them other than repeatedly telling them to check the smoke detectors or leave, and appellant agrees with this. An audio recording could only confirm what is already undisputed.

On cross-examination, appellant was questioned about his rifle.

> Q. [I]t was there to give a visual effect, correct?
> A. Yes.
> . . . .
> Q. Well, [P.S.] and [P.M.] came into your house, and you brought the rifle up, put it on the end of your chair, pointed it towards the ceiling for visual effect, right?
> A. They weren't supposed to be there, so why were they there?
> Q. . . . Were you using [the rifle] at the time for visual effect?
> A. Yes.
> Q. And that visual effect is that you'll use the gun? Why else –
> A. If—if—Yes. Yes. If – yes.

7

Q. And so you're using that [gun] to intimidate them, correct?

A. No.

Q. Isn't it true you told [the officer in your statement after you were arrested] that it was for intimidation?

A. The gun, yeah.

. . . .

Q. And so the purpose then of bringing a gun from the floor up to the ground to get your point across is to intimidate?

A. Oh, yes. Yes.

Q. It's to intimidate, right?

A. No. To get attention. [P.S.] was going for the stairwell, and I said, "No, you're going to check [the smoke detectors] there or leave." And at the same time I was doing that, if you hear it on the tape, you can hear the springs of the recliner creak as I reach over, grab [the gun], pick it up. When he turned back around, he didn't move again.

Q. Because there was a gun there, right?

A. I don't – I don't know. I guess, yes.

Q. So you're using that for visual effect to get what you wanted them to do?

A. Yes. Yes.

. . . .

Q. And you had that blank there to scare them, correct?

A. To scare intruders, yes.

Q. And [P.S.] and [P.M.]?

A. Yeah, if they would have gone upstairs, gone through my house.

. . . .

Q. On April 10, 2013, when [P.S.] and [P.M.] were in your home, your first shot that day was going to be a warning shot, correct?

A. Yes.

Q. And that was with the blank, correct?

A. Yes.

Q. And that was to intimidate them or make them think it was going to shoot them, correct?

A. Them, yeah. . . .

Q. So you're holding the rifle, having it pointed straight up sitting next to you, in your head, you're thinking you can use this to intimidate them; is that fair to say?

A. Yes . . . .

Q.     So if there's a rifle in a room, that helps get people's attention, correct?

A.     Yeah.

Q.     So that's why you were holding it, correct?

. . . .

A.     Yes.

Q.     And it's to get people's attention because using a rifle could hurt people, correct?

A.     Correct.

. . . .

Q.     . . . [O]n April 10 of 2013, you needed to show them that you were serious, right?

A.     Yes, because they went for the stairwell – or [P.S.] went towards the stairwell.

Q.     And serious enough that you wanted them to know that you would use the rifle?

A.     Yeah.  I spoke at the same time that I picked it up.  I don't know if it was the gun or my words that made [P.S.] turn around and finish doing the smoke detectors and then tell me that he wasn't afraid of me.

Q.     . . . [Y]ou wanted him to be afraid?  You wanted him to stop what he was doing?

A.     No.  I wanted him to listen.  You don't have to be afraid to listen.

Q.     But to get someone to listen, you have to use a rifle?

A.     Yeah.  It was sitting there in the open, and he went for the stairwell.

Q.     Okay.

A.     So then I picked it up to show him that it's not just there as a lamp shade.

Q.     It's there to be used?

A.     Yeah.

Thus, appellant's own testimony shows that he intended to shoot his rifle if P.S. and P.M. did not comply with his wishes and that the rifle was present to intimidate them into complying with his wishes.

Appellant relies on *State v. Nicks*, 831 N.W.2d 493, 508, 510 (Minn. 2013) (defendant whose counsel failed to follow through with obtaining the murder victim's

cellphone records when the defense was built around a phone call had "made sufficient allegations that counsel's assistance fell below an objective standard of reasonableness to warrant an evidentiary hearing" and that this failure "may have prejudiced [defendant] at trial"). But *Nicks* is distinguishable. In that case, whether a phone call between the defendant and the victim on the evening of the murder had occurred was central to the defense and would have been resolved if the victim's cellphone records were produced. *Id.* at 506-08. Here, the audio recording would do nothing to resolve whether appellant pointed his rifle at P.S. and P.M. and would add nothing to the undisputed evidence as to what appellant told them while they were in his house.[1]

Appellant was not deprived of his right to effective assistance of counsel.

## 2. Sentencing

Appellant's motion for a downward dispositional departure was denied, and he was sentenced to the mandatory minimum of 36 months in prison. *See* Minn. Stat. § 609.11, subds. 5(a), 9 (2012) (imposing sentence of "commit[ment] to the commissioner of corrections for not less than three years" on anyone who, while committing assault, "had in possession or used, whether by brandishing, displaying, threatening with, or otherwise employing, a firearm"). Only in a "rare" case will an

---

[1] Appellant's reliance on *Dereje v. State*, 812 N.W.2d 205, 212 (Minn. App. 2012) (concluding that "because trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, appellant was deprived of his right to effective assistance of counsel"), is misplaced. *Dereje* was reversed. *See Dereje v. State*, 837 N.W.2d 714, 717 (Minn. 2013) ("Ineffective-assistance-of-counsel claims fail when counsel demonstrates reasonable strategic calculation throughout the representation and secures a favorable outcome for his client in the face of multiple felony charges and considerable evidence of guilt.").

appellate court reverse the imposition of a presumptive sentence. *State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981). Review of a district court's decision whether to depart from the guideline sentence when there is a proper basis for departure is "extremely deferential." *Dillon v. State*, 781 N.W.2d 588, 595-96 (Minn. App. 2010), *review denied* (Minn. July 20, 2010). However, "a [district] court has no discretion to depart from the sentencing guidelines unless aggravating or mitigating factors are present." *State v. Spain*, 590 N.W.2d 85, 88 (Minn. 1999). Factors to consider in a dispositional departure include a defendant's age, prior record, remorse, cooperation, attitude while in court, and support of friends and/or family. *State v. Trog*, 323 N.W.2d 28, 31 (Minn. 1982).

Appellant argues that "[t]he [district c]ourt's failure to discuss the low risk to reoffend and carefully consider all of the *Trog* factors constituted an abuse of discretion." But there is no requirement that the district court discuss all the *Trog* factors before imposing a presumptive sentence. *State v. Pegel*, 795 N.W.2d 251, 254 (Minn. App. 2011); *see also State v. Van Ruler*, 378 N.W.2d 77, 80 (Minn. App. 1985) (stating that, if district court considers reasons to depart but elects to impose the presumptive sentence, no explanation for denying departure is required).

In any event, the district court's statement at the sentencing hearing demonstrates its consideration of some of the *Trog* factors and gives its reasons for denying departure:

> You do have some positives here. I'm not going to deny that . . . . You've got a fairly minimal record. You're fairly older in age. You do have support of friends and family, no doubt about it. But you're here because of April 10, 2013, one snapshot in time, [and] what you did [then] was a very serious charge under Minnesota law.

You just can't point a weapon at others, assault them, cause fear. And it's obvious you caused fear in the individuals that were involved in this case. And quite frankly, the reason seems kind of petty. They were [t]here to just do an inspection in your apartment. They gave you notice. They knocked on the door. You didn't answer. They kind of opened the door, called again. You're there with a gun. You assault them with a gun. We know you had altered a bullet. But legally it doesn't matter; it could be a disabled gun. It caused fear in the victim here. And there are mandatory minimums that flow from this.

Appellant also argues that the district court failed to consider that he is at "low risk to reoffend" and amenable to probation, based on information in the presentence investigation (PSI) that his Level of Service/Case Management Inventory (LSCMI) score was 13. But the PSI recommended that appellant "be committed to the Commissioner of Corrections for a period of 36 months." Moreover, at the sentencing hearing, appellant's attorney said she "believe[d] . . . that score would be on the high end of low or on the low end of moderate, a moderate score." The district court did address appellant's argument that he is amenable to probation:

But I'm not satisfied that there is a specific probationary program that you could fit into in this situation. You obviously don't want to suffer the consequences of your own behavior, but this is a mandatory minimum sentence.

I don't really find substantial and compelling circumstances to put you on some behavioral program in a probationary setting to keep the community safe. You know, you couldn't get along with your own landlords, you know, in a fairly minimal relationship during a smoke detector alarm check. I'm not real confident you're going to do real well in a probationary setting either. If you're a tenant in an apartment and they have to do these minimal checks for the safety and security of everybody involved, including yourself, and you think you have . . . to have a gun involved, point the gun, threaten people.

12

> . . . And to the extent you make decisions that are very, very poor that can cause a lot of fear in individuals, I'm not confident you won't do that into the future either.

This court "may not interfere with the sentencing court's exercise of discretion, as long as the record shows the sentencing court carefully evaluated all the testimony and information presented before making a determination." *Van Ruler*, 378 N.W.2d at 80-81. The sentencing court here clearly evaluated the testimony and information presented before imposing the presumptive sentence on appellant. There is no basis to reverse that sentence.

**Affirmed.**